ECJKBENS

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          14 CR 203 (RJS)

5    DARRELL BENNETT,

6                   Defendant.

7    ------------------------------x

8                                          New York, N.Y.
                                           December 19, 2014
9                                          2:20 p.m.

10

     Before:
11
                        HON. RICHARD J. SULLIVAN,
12
                                           District Judge
13

14                          APPEARANCES

15

     PREET BHARARA,
16        United States Attorney for the
          Southern District of New York
17   EUN YOUNG CHOI
          Assistant United States Attorney
18

     PEGGY CROSS-GOLDENBERG
19        Attorney for Defendant

20

     ALSO PRESENT:  KATE HADLEY, Defense Paralegal
21

22

23

24

25

ECJKBENS

1          THE COURT:  This is United States versus Bennett.  Let

2    me just take appearances.

3          For the government?

4          MS. CHOI:  Good afternoon, Your Honor.  Eun Young

5    Choi, on behalf of the government.

6          THE COURT:  Ms. Choi, good afternoon.

7          And for the defendant?

8          MS. CROSS-GOLDENBERG:  The Federal Defenders of

9    New York, by Peggy Cross-Goldenberg, for Mr. Bennett.  I'm

10   joined at counsel table by Kate Hadley, a paralegal in our

11   office.  Good afternoon, Your Honor.

12         THE COURT:  Good afternoon to each of you.  Thank you.

13         We have some friends and family members here as well,

14   Ms. Cross-Goldenberg?

15         MS. CROSS-GOLDENBERG:  Yes, Your Honor.  If I may, I

16   can introduce them now.

17         THE COURT:  Sure.

18         MS. CROSS-GOLDENBERG:  Mr. Bennett's mother, Wanda

19   Clark, is here; his aunt, Tina Davis; his friend, Jordan

20   Powell, who the Court may remember from the day of

21   Mr. Bennett's guilty plea --

22         THE COURT:  Yes.

23         MS. CROSS-GOLDENBERG:  -- his friend, Charese Nahay;

24   another friend, Ashley Shacklehorn; and another friend, Andrew

25   March.  All of these individuals, Your Honor, have written to

ECJKBENS

1    the Court.  Their letters were attached to my submission, and

2    they all wanted to be here to support Mr. Bennett.

3         THE COURT:  Thank you, all, for being here.  It is a

4    public courtroom, so everyone is welcome here, but I'm sure

5    your presence means a great deal to Mr. Bennett.  And thank you

6    for writing letters.  I think letters are very helpful in all

7    cases, really.  I only get a short time to spend with a

8    defendant, and the time I spend with the defendant is very

9    artificial in a sense.  It's in a courtroom, so I don't really

10   get to know the person.  So letters from people who do know the

11   person are very, very helpful.  So thank you for taking the

12   time, thank you for being here today.

13        We are here for sentencing.  Mr. Bennett pled guilty

14   before me back in September.  I want to go over with the

15   parties what I have reviewed in connection with sentencing, and

16   if I've left anything out, of course, let me know.

17        I have, first of all, reviewed the transcript of the

18   guilty plea proceeding.  I presided over it, but I think it's a

19   good policy to refresh oneself with what was said and what went

20   on.  So I've done that.  I've also reviewed the presentence

21   report prepared by the probation department.  That's a report

22   dated November 24th.  It is a 26-page single-spaced submission

23   that includes a sentencing recommendation of 97 months.

24        I have also have the submission of

25   Ms. Cross-Goldenberg dated December 5th.  It is a

ECJKBENS

1    characteristically thorough and lengthy -- they're not all this

2    lengthy, but characteristically thorough -- 23-page

3    single-spaced submission that includes numerous attachments,

4    including letters that I've already alluded to, other things as

5    well.  I'm not going to itemize what they are just because it's

6    publicly docketed, I've read everything attached, so thank you.

7            I have reviewed the victim impact statements that were

8    enclosed with the November 19th letter from Wendy Olsen Clancy,

9    who is the victim witness coordinator at the United States

10   Attorney's Office.  I have also reviewed the attachments to the

11   December 5th, 2014 letter of Ms. Olsen Clancy that includes a

12   restitution request for one of the victims who was depicted in

13   the videos that were taken off of the computer of Mr. Bennett.

14   That's a voluminous set of material.

15           I've also reviewed the government's sentencing

16   memorandum, which is dated December 12th.  It is a 20-page

17   double-spaced submission.  It also includes a number of

18   attachments that I have reviewed also.

19           So I think that's everything I have received in

20   connection with sentencing.  Have I left anything out?

21           MS. CHOI:  The government does not believe so, Your

22   Honor.

23           MS. CROSS-GOLDENBERG:  I don't think so, Your Honor.

24           THE COURT:  All right.  Then I guess -- I don't think

25   the parties have really responded to the restitution request.

ECJKBENS

1           MS. CHOI:  Yes, Your Honor.  That was one of the

2    matters that I was going to bring to the Court's attention.

3    Obviously, restitution is mandatory under 2259(a).  The

4    government has had the opportunity to review the December 5th

5    materials.  We have started to talk about that issue with

6    defense counsel to try to come up with a restitution number

7    that would potentially satisfy any further litigation on the

8    question.  So we would request that we'd be granted the 90-day

9    continuance, as is allowed under the statute, to allow us to

10   continue those negotiations and try to see if it's possible to

11   come up with an agreed upon restitution figure.  I think the

12   application of Paroline factors is sort of uncharted territory,

13   so we want to sure that we're getting the restitution figures

14   right, Your Honor.

15           THE COURT:  And no objection to that?

16           MS. CROSS-GOLDENBERG:  No objection, Your Honor.  We

17   received this request after my sentencing submission had

18   already been submitted.

19           THE COURT:  Right.

20           MS. CROSS-GOLDENBERG:  And as I have mentioned to

21   Ms. Choi, it's not clear to me how this individual fits into

22   this case, and so that would be the first thing that we would

23   have to determine.  Even in the cover letter from the

24   attorneys, they sort of say presumably he's a victim here.  And

25   so I went through the list of videos that the government

ECJKBENS

1   attached to its sentencing submission and didn't see the ones

2   that appeared to be referenced in this letter.  So that's the

3   first thing we'll have to work out.  And then if the parties

4   can come to some agreement, if restitution is appropriate, on a

5   number, I think we can submit that to the Court in plenty of

6   time for the Court to enter restitution in the 90 days.

7            THE COURT:  All right.  Yes, I had the same reaction

8   that you did.  It wasn't exactly clear to me where the victim

9   seeking restitution exactly lines up in what's referenced in

10  the presentence report, so I think that would be worth nailing

11  down.

12           Similarly with the victim impact statements, these are

13  clearly victim impact statements that appear to have been

14  prepared in connection with other sentencings, and not

15  surprisingly, where there are videos or photos that are shared,

16  there might be multiple sentencings at which the victim

17  impacted statement is relevant, and so these are not tailored

18  to this case.  It's not exactly clear to me which files, or

19  videos, or items seized from the computer are referenced by

20  these victim statements.

21           MS. CHOI:  Your Honor, just for some clarity on that

22  question, if Your Honor is curious, I can explain the procedure

23  by which these things are generally generated.  It's through a

24  national clearinghouse.

25           THE COURT:  Yes.

ECJKBENS

1          MS. CHOI:  But Ms. Cross-Goldenberg has brought this

2     to my attention.  I didn't double-check with NCMEC to figure

3     out precisely which videos align with these.  I would just say,

4     though, Your Honor, that the videos that we have attached here

5     are simply some of the suspected CP videos there are also child

6     pornography videos.  There are other images that were also

7     recovered from the defendant's computer that weren't included

8     in this list.  So that may be part of the explanation.

9          THE COURT:  But there are no objections with respect

10     to the victim impact statements at this point,

11     Ms. Cross-Goldenberg?

12          MS. CROSS-GOLDENBERG:  I think, Your Honor, to the

13     extent the Court has articulated -- and I was going to talk

14     about this a little later -- it's not so much an objection, the

15     Court's already read them obviously, I can't unring that bell,

16     but I do note that they contain sort of a disclaimer, in fact,

17     an explicit disclaimer that says there should be further

18     follow-up to make sure that they actually apply in a given

19     case, and I haven't seen any follow-up on that.  As far as I

20     know, the government hasn't produced to me any sort of

21     follow-up that necessarily links these letters to this case.

22          And I think, as the Court correctly notes, these

23     letters clearly predate Mr. Bennett's conduct in this case.

24     They're clearly aimed at the individual who made the videos.

25     And so in terms of what they actually tell us for this

1    sentencing, I don't think that it's very much.

2              THE COURT:  Well, they certainly tell us that there

3    are victims to these crimes, and that the people depicted on

4    these videos are real people, real children, who were

5    brutalized and violently, violently raped.  So that, we do

6    know.  It's hard for me to know which -- there are redactions,

7    too, so it's hard to know exactly how they link up to what's

8    referenced in the presentence report.  So it's hard for me to

9    know exactly what they relate to.  They talk about a particular

10   series that includes multiple victims, but maybe, you know,

11   Ms. Choi, what series that's referenced in the victim impact

12   statements is where it connects to the presentence report.

13             MS. CHOI:  I'm not sure that they do connect to the

14   presentence report, Your Honor, and I think there needs to be a

15   little clarity about how the system works.  There is a national

16   clearinghouse that's relied upon in these type of prosecutions.

17   When I referred to NCMEC, it's, I believe, the National Center

18   for Missing & Exploited Children.  They keep a database of

19   identified victims that have been identified primarily

20   domestically by law enforcement that appear in certain child

21   pornography videos.

22             In my experience, from having prosecuted these cases,

23   very few of those -- a small percentage of the total videos

24   that are exposed in any given child pornography case are

25   actually -- contain actual identified victims for which there

ECJKBENS

1    would be anything on file, including a victim statement.

2    Oftentimes these victim statements aren't tailored to the

3    particular defendant because they're filed when the statements

4    were made in other contexts, but they're supposed to give the

5    Court some guidance as to the impact that this particular crime

6    had on these victims.  In fact, I would say that this is -- the

7    December 5th submission is the first time I've seen something

8    that's particularly tailored to a defendant at issue.

9            But I will double-check on that.

10           THE COURT:  Paragraph 21 says that, "According to

11   information from the National Center for Missing & Exploited

12   Children database, the images possessed by the defendant

13   included 11 different series depicting known child victims."

14           MS. CHOI:  Correct.

15           THE COURT:  "The series may contain images of more

16   than one victim.  Three victim impact statements furnished by

17   the U.S. Attorney's Office will be attached to the Court's copy

18   of the final presentence report."

19           So I assume that's a reference to what I got from

20   Ms. Olsen Clancy, and that the videos that are identified at

21   pages 5 through 7 of the presentence report include the 11

22   different series that depict known child victims, and that the

23   victim impact statements are from a subset at least of those

24   series.

25           MS. CHOI:  Your Honor, I think that the videos that

ECJKBENS

1    are described at pages 5 through 7 of the PSR are actually the

2    specifically videos for which the reviewing case agent saw the

3    images and explained what they were in written form so that we

4    could proceed in prosecuting on that basis.  They don't

5    necessarily link up particularly to those victim impact --

6              THE COURT:  Why do you say that?  This says, "The

7    images possessed by the defendant include 11 different series

8    depicting known child victims."  You don't think they link up?

9              MS. CHOI:  Well, because, Your Honor, this is only a

10   subset, the 5 through 7 is only a subset of the total number of

11   child pornography videos that were on the defendant's computer,

12   because there were 79, I believe, videos that were there.  So

13   what I'm saying is, I don't know if these particular victim

14   impact statements match the videos that are on pages 5 through

15   7 as the ones that had been also reviewed by the case agent or

16   if they match up by title and by -- I think they also use other

17   electronic identifiers to the listed known series that existed

18   in the NCMEC database.

19             But, again, I'll go and double-check this.  I think --

20             THE COURT:  But double-check it when?  Because

21   sentencing is going forward today.  We can do restitution

22   later.

23             MS. CHOI:  Yes, Your Honor.  I think with regard to

24   the December 5th issue, which is restitution, that's one thing.

25   I think, Your Honor, with regard to the victim statements that

ECJKBENS

1    are in the earlier submissions, the three that are in the known

2    series, I would say this, that they are depictions of what

3    happens in victimization in these child pornography cases.  I

4    know, Your Honor, I believe in other sentencing of child

5    pornography cases has made references to victim impact

6    statements as illustrative of what happens to a child even if

7    it was not the child that was victimized as depicted in the

8    videos for that particular defendant.

9            So we would say that, Your Honor, you can move forward

10   on the question of the nature of the offense from gleaning from

11   pages 5 through 7 of the PSR the descriptions of what those

12   particular videos are as, I think, self-sufficient with regard

13   to what depictions of violence there are and with the

14   understanding that presumably, given what was happening to

15   those children, those children were also victimized.  The

16   children for which there is no NCMEC statement were also

17   subject to victimization through the creation of that child

18   pornography and its distribution.

19           THE COURT:  It wasn't clear to me that these were

20   supposed to be illustrative as opposed to the actual

21   individuals who were depicted in videos that were found on the

22   computer.  You're not sure about that?

23           MS. CHOI:  Your Honor, I have no reason to believe

24   that they're not.  Ms. Cross-Goldenberg just brought to my

25   attention that she thinks there may be some problem with this.

ECJKBENS

1    I will go back to NCMEC and double-check to make sure that we

2    have the correct videos, but they are consistent with the NCMEC

3    information that I had received from the agents that said that

4    the Sponge Bob series was one series that had been identified

5    as being on the defendant's computer, so I have no reason to

6    believe that that is an inaccurate -- that the letters are not

7    matching up to those victims.  I'm just trying to clarify that

8    they're not necessarily the videos that are portrayed on pages

9    5 through 7 of the PSR, and I don't know which particular video

10   because when NCMEC makes these identifications, they don't

11   spell out what the title of the video is.

12            THE COURT:  Ms. Cross-Goldenberg?

13            MS. CROSS-GOLDENBERG:  And I think, Your Honor, as I

14   said, we haven't received any information showing that there

15   actually has been a linkage or any kind of follow-up.  When I

16   followed up with probation about this paragraph in the draft

17   presentence report, they didn't provide me with any further

18   information.  And I think the way I understand this, there are

19   different levels of identification of files found on someone's

20   computer, so you can look at the name of a file, and it may

21   match the name of a file in a law enforcement database, but

22   that doesn't necessarily mean that the images that are

23   contained in the file match the images of the known victims,

24   for example.

25            So I think that's why the disclaimer precedes all of

ECJKBENS

1  these victim impact statements to say don't just assume that

2  this matches.  And, of course, here we can't even tell because,

3  as the Court noted, the name of the series is redacted, so

4  there's no way for me to know whether they match up.  But

5  there's an instruction that in order to make sure that these

6  victim impact statements apply in your case, you call the case

7  agent, and then that individual actually looks at not the name

8  of the file, but the actual content of the file.

9         And what I'm saying is that I don't think that has

10 been done here.  I'm almost certain that probation didn't come

11 to that.  I don't think the probation officer has any

12 information about who are the known victims or not.  And so I

13 don't think probation went through that exercise of matching

14 people to files.

15        THE COURT:  No, I assume the case agent informed the

16 probation officer as to the fact that of the files that were

17 seized from the computer, some of them have been identified,

18 and witnesses have been found that relate to the files that

19 were recovered.  That seemed to me the inference to be drawn

20 from what I read.

21        In any event, we'll talk about the presentence report

22 in a minute, but there's no dispute about the accuracy of the

23 descriptions at pages 5 through 7 of the videos; is that right?

24        MS. CHOI:  Not from the government, Your Honor.  Those

25 were provided to the government -- sorry, to probation by the

ECJKBENS

1   government and the case agent.

2          THE COURT:  Okay.

3          Ms. Cross-Goldenberg?

4          MS. CROSS-GOLDENBERG:  No, Your Honor.

5          THE COURT:  Okay.  Well, then, let's start with the

6   presentence report.  The presentence report has been made

7   available to the parties.

8          And so, Ms. Cross-Goldenberg, you've received a copy

9   and reviewed it with your client?

10         MS. CROSS-GOLDENBERG:  Yes, Your Honor.

11         THE COURT:  And do you have any objections to what's

12  in the presentence report?

13         MS. CROSS-GOLDENBERG:  No, Your Honor, other than to

14  one of the recommended conditions of supervision at the end,

15  but we can talk about that when we get there.

16         THE COURT:  Okay.

17         Ms. Choi, you've received a copy of the presentence

18  report.  Do you have any objections to it?

19         MS. CHOI:  Not from the factual descriptions, Your

20  Honor.  As set forth in the government's submission, we would

21  submit that the guidelines calculation that's applicable for

22  the enhancement due to the distribution was -- should have been

23  a five-point enhancement under 2G2.2(b)(3)(B) as opposed to the

24  one that probation put in, which is 2G2.2(b)(3)(F).

25         THE COURT:  So we'll talk about that in a minute.

ECJKBENS

1          So let me just remind Mr. Bennett, and perhaps explain

2     to others who maybe weren't here on the day of the guilty plea,

3     that there are certain factors that a judge is required to

4     consider before imposing a sentence.  And those factors include

5     the history and characteristics of the defendant.  I have to

6     obviously consider the entire person, not just the crime.  I

7     have to consider this person that I am imposing a sentence on,

8     I have to make sure that the sentence is tailored to the

9     person, that there's a full appreciation of the human being in

10    all his complexity and uniqueness.  So that's important.

11          Another factor that the judge has to consider, of

12    course, includes the seriousness of the crime.  This is a very

13    serious crime, and the judge has to consider the circumstances

14    and facts relating to this crime.  The fact that this is a

15    crime that involves children, children who were brutally -- in

16    some cases, brutally raped, viciously raped -- I mean any

17    sexual activity with a ten-year-old or a child is rape by

18    definition, but some of the images that are described in the

19    presentence report involve violent acts perpetrated against a

20    child who's in obvious pain and distress, and that's

21    particularly heinous.  So the sentence has to reflect the

22    seriousness of this crime and has to provide a just punishment

23    for this crime.  It has to promote respect for the law.

24          Another factor that judges have to consider is the

25    need to deter or discourage future conduct of this kind.  The

ECJKBENS

1    hope is that by imposing a sentence in one case, the judge will

2    impress upon the defendant that this is behavior that can't be

3    repeated, but, also, hopefully impress upon a larger public

4    that this is intolerable, and that the penalties will be great,

5    and hopefully the result will be that there is less future

6    criminal conduct, that people learn from it and change their

7    behavior as a result of it.  That's the hope.  That's an

8    important factor that judges have to consider.  It's something

9    Congress has said courts have to take into account.

10         Other factors include the defendant's needs while in

11   custody, so the need for mental health treatment, or substance

12   abuse treatment, or counseling.  There are different needs that

13   defendants have that need to be addressed while they're in

14   custody, and courts need to take that seriously.

15         Another factor that courts have to consider is

16   something called the United States Sentencing Guidelines, and,

17   Mr. Bennett, I'm sure you'll recall, we talked about the

18   guidelines.  I know Ms. Cross-Goldenberg has gone over these

19   with you.  But for those who may not have been here, the

20   Sentencing Guidelines are a big book.  This is a manual

21   prepared by a commission that includes judges and lawyers,

22   experts in the field of criminal law.  And the book is designed

23   to help judges like me decide what will be an appropriate

24   sentence, and so for every crime or type of crime, there's a

25   chapter in this book, and the judge is instructed to go to that

ECJKBENS

1   chapter and to make certain findings.

2           So depending on those findings, the judge assigns

3   points.  It's sort of like accounting in many ways.  It's

4   adding points, and subtracting points, and ultimately coming up

5   with a number, and that number is referred to as the offense

6   level.

7           There is then another chapter in this book that

8   relates to criminal history, and not surprisingly, people who

9   have gone to jail before for crimes will typically be treated

10  more harshly than a person who has no prior criminal

11  convictions.  So the judge, again, is instructed to go to that

12  chapter, make findings as to whether there are prior

13  convictions; if so, when and for how long, and depending on the

14  answers to those questions, the judge assigns points, adds

15  them, and ultimately comes up with another number, and that

16  number is referred to as the Criminal History Category.

17          And there are six Criminal History Categories.

18  Category I is the lowest and least serious, and Category VI is

19  the highest and most serious.  So once the judge has made those

20  two findings, the offense level and the Criminal History

21  Category, the judge is instructed to go to the back of this

22  book where there's a table or a grid -- you can't really see it

23  from here, but there's a column here on the far left, and

24  that's the offense level column, and the judge goes down that

25  column, stopping when he or she gets to the number; that is,

1   the offense level in the particular case.

2          The judge then goes across from left to right these

3   other columns which relate to the Criminal History Category,

4   stopping where the judge reaches the appropriate Criminal

5   History Category.  And where the judge's finger finally rests,

6   well, that is the range that in the view of the commission that

7   prepares this book would be appropriate.  It's a range in terms

8   of months.

9          And so, ultimately, the judge doesn't have to follow

10  this book, the judge can go higher or lower, but the judge does

11  have to consider the book and make findings under this manual.

12         Finally, the last factor that judges are instructed to

13  consider is the need to avoid what's often referred to as

14  unwarranted sentencing disparities between similarly situated

15  individuals.  That's basically -- this is the point, which is

16  that judges, before imposing sentence, should take a step back

17  to make sure that the sentence imposed in a particular case is

18  in line with sentences imposed on other defendants who are

19  convicted of similar crimes, who have similar criminal

20  histories.  It would be wrong, and probably would promote

21  disrespect for the law, if some people got very high sentences,

22  and others quite low sentences, just by virtue of who the judge

23  was.  And so judges have to make sure that the sentences they

24  impose are roughly in line with sentences imposed more

25  generally for similar conduct in similar circumstances,

ECJKBENS

recognizing that no two people are exactly alike, no two cases

exactly alike.  So those are the factors that I have to

balance, those are the things that judges are required to

consider and take into account in fashioning a sentence.

We are going to spend a little bit of time talking

first about the Sentencing Guidelines and how they apply in

this case.  After that, we'll talk about some of the other

factors, but we'll start with the presentence report, which

lays out the probation department's view of the guidelines in

this case.  So the probation department concludes that the base

offense level is level 18 pursuant to Section 2G2.2 of the

guidelines.

There is then a two-level increase because the

material that the defendant possessed involved a prepubescent

minor or a minor who had not attained the age of 12 years, so

that's a two-level increase pursuant to Section 2G2.2(b)(2).

The presentence report then recommends a two-level increase

because the offense involved the distribution of materials

described in Sections (a) through (e) of the guideline section,

so that's a two-level increase.  That's a disputed fact, we're

going to come back to that one.

There is then a four-level increase because the

material that the defendant possessed portrays sadistic or

masochistic conduct or other depictions of violence.  So that's

a four-level increase pursuant to Section 18 -- well, Section

ECJKBENS

1     2G2.2(b)(4) of the guidelines.

2            There is then another two-level increase because the

3     offense involved the use of a computer or interactive computer

4     service for the possession, transmission, receipt, or

5     distribution of the material.  So that's two levels pursuant to

6     2G2.2(b)(6).  And then a five-level increase because of the

7     number of images.  In this case, the images are approximated to

8     be almost 6,000.  600 or more is what yields a five-level

9     increase, so that would be a level 33.

10           There is then a reduction of three levels because

11    Mr. Bennett pled guilty in advance of trial, he acknowledged

12    and accepted responsibility for his crimes, and so that merits

13    a three-level reduction pursuant to Section 3E1.1(a) and (b).

14           So I guess the only dispute, I think, between the

15    parties is with respect to Section 2G2.2(b)(3).  Is that

16    correct?  Have I characterized this accurately?

17           MS. CHOI:  I believe so, Your Honor.

18           THE COURT:  Ms. Cross-Goldenberg?

19           MS. CROSS-GOLDENBERG:  I'm sorry, what was --

20           THE COURT:  The only dispute is with respect to

21    paragraph 28 --

22           MS. CROSS-GOLDENBERG:  Right.

23           THE COURT:  -- and the enhancement under subsection

24    (b)(3), correct?

25           MS. CROSS-GOLDENBERG:  Yes, Your Honor.

ECJKBENS

1          THE COURT:  Okay.  So let's, then, talk about that.

2          The government has the burden to establish by a

3     preponderance that the facts relating to that subsection are

4     appropriate, that the enhancement, therefore, is appropriate.

5          Go ahead, Ms. Choi, I'm happy to hear you.

6          MS. CHOI:  Your Honor, I think it's set forth in the

7     government's submission at pages 5 through 6.  I think that the

8     application notes make plain that the five-level enhancement

9     applies to any transaction, including bartering or in-kind

10    transaction that is conducted for a thing of value, but not for

11    profit, and then further defines a thing of value as anything

12    of value or consideration, which could include child

13    pornographic material received in exchange for other child

14    pornographic material bartered in consideration for the

15    material received.

16          And I think that that is illustrated -- the

17    applicability of this guidelines range is illustrated by the

18    means in which the defendant received the child pornography by

19    his own admission.  I don't think it's in dispute that he was

20    using a computer program known as GigaTribe, which I think the

21    government's submission goes into great length in explaining,

22    in accordance with the Second Circuit's decision in Ryan Gold.

23    And I think that -- the way in which that computer system is

24    set up is, you need to share files in order to get files from

25    others.

ECJKBENS

1          In this case, as the attachments show, the defendant

2     shared his password with numerous other people on numerous

3     occasions, including the undercover agent from Homeland

4     Security, that transaction which formed the basis for the

5     complaint, as well as the government has learned with an FBI

6     agent.

7          And in trading those passwords, I would also note that

8     it is clear that the defendant in the statements to the defense

9     expert, Dr. Bardey, made plain that he understood that the way

10    that this worked is that this is a sharing environment on

11    GigaTribe, and that if he wasn't sharing the images, it

12    wouldn't have been spread in this way.

13          I think the bartering nature of GigaTribe, the sharing

14    of the passwords, and the defendant's own actions clearly

15    establish that bartering in kind occurred both with regard to

16    the child pornographic materials at issue here and other things

17    that Mr. Bennett shared with others by sharing his password on

18    that particular service.  And so for those reasons, I think

19    that the guidelines enhancement applies here.

20          THE COURT:  All right.

21          Ms. Cross-Goldenberg?

22          MS. CROSS-GOLDENBERG:  Thank you, Your Honor.

23          Let me start out by saying that I think that we're

24    even having this argument sort of supports our position and

25    underscores the Second Circuit's decision in Dorvee that the

ECJKBENS

1    guidelines here are not entitled to deference.

2              THE COURT:  We'll get to deference in a minute, but I

3    do have to do a calculation as an initial matter.

4              MS. CROSS-GOLDENBERG:  I understand that, Your Honor.

5              And I think, as I said, as an initial matter, it just

6    underscores this would take us to a place four years over the

7    statutory maximums.  So I think when the Court considers that,

8    and the Court considers the view of the probation department,

9    and the Court considers the conduct that, as the Second Circuit

10   says, is inherent in almost every one of these kinds of cases,

11   this isn't the sort of case that would warrant that high

12   five-level enhancement based on actual bartering and trading.

13             As the Court can see, I know the government attached

14   the chats to their sentencing submission, and there are not

15   sort of explicit requests for particular types of child

16   pornography or particular files.  It's very rapid fire, what's

17   your password, what's your password, what's your password,

18   what's your password, and it's not so much like setting up

19   bartering explicitly, I will give you this if you give me this.

20             So I think the two levels covers it on the facts of

21   this case.  The chats, which I'll go into a little later, there

22   are questions where sometimes people say what are you into or

23   what are you looking for.  There are also conversations where

24   people tell Mr. Bennett, you know, is that all you had, as if

25   like his stuff wasn't good enough, or different enough, or

ECJKBENS

1    wasn't new enough for them, and so I think on what we know, I

2    don't think the Court can make a finding, for example, that

3    he -- by giving his password, he gave somebody else new child

4    pornography that they didn't previously have access to or that

5    they were able to access from --

6            THE COURT:  I think the point here, what we ought to

7    be focused on, is the language of the enhancement and the

8    application note.  So we're talking about distribution for the

9    receipt or expectation of receipt of a thing of value.

10           So the distribution occurred, clearly.  It's whether

11   it was done for the receipt or the expectation of receipt of a

12   thing of value.  So no evidence that money changed hands, so

13   the thing of value that the government is arguing is what, the

14   expectation that he would receive reciprocal child pornography

15   from other users of the site?

16           MS. CHOI:  That's correct, Your Honor.

17           THE COURT:  And what's the evidence of that?

18           MS. CHOI:  Your Honor, I think that if you go to page

19   4 of Government Exhibit D to the sentencing submission --

20           THE COURT:  Wait, wait, let me get there.

21           Okay, yes?

22           MS. CHOI:  I think it's a little difficult to read

23   because it is quite small, but if you see the discussions that

24   Getitin2012, which is the defendant's user name, has with the

25   plumber, which --

ECJKBENS

1              THE COURT:  Page 4?

2              MS. CHOI:  Yes, beginning at approximately line 180.

3              THE COURT:  180, with the plumber?

4              "Hello.  What are you into?

5              "Hi.  Password.  Hi, what's up?  I'm in teens, boys

6    and stuff.  What about you?  Three to fifteen, B//B, M//B,

7    B//G, pass for pass."

8              That's what you are referring to?

9              MS. CHOI:  Yes, Your Honor.  And I think this is just

10   an example of how this systems works.  It's that users can

11   speak with one another and exchange passwords with a query as

12   to what they have to offer.  And here, the defendant is saying,

13   I'm into teens, boys and stuff is his interest of what child

14   pornography he would like, and the plumber, this other user, is

15   saying that he likes people who are between the ages of three

16   to fifteen, and I believe that the B//B is boy on boy, M//B is

17   man on boy, and then B//G is boy on girl.  So he's explaining

18   the type of child pornography he's seeking.

19             THE COURT:  Pass for pass, means you give me your

20   password, I'll give you my password.

21             MS. CHOI:  Correct, Your Honor.

22             THE COURT:  "Yeah.  Mine is 'fun' LOL.  Mine is

23   'FFK25.'"  So it's an exchange of passwords, is what you are

24   saying?

25             MS. CHOI:  Yes, Your Honor.  And I think that's

ECJKBENS

1    illustrative of the way in which the bartering occurs on

2    GigaTribe, you share passwords, you get access to other

3    people's files.  In this case, that's how the defendant got

4    access to child pornography and distributed child pornography.

5              THE COURT:  Okay.  Ms. Cross-Goldenberg, do you

6    disagree with any of that?

7              MS. CROSS-GOLDENBERG:  I think, Your Honor, when --

8    especially where a guideline sets up different gradations of

9    enhancements for a particular type of conduct, and the question

10   here is should we jump to the fifth level, I think this falls

11   clearly within the Second Circuit's opinion in Dorvee, that,

12   no, because it doesn't leave us any room to distinguish between

13   people who are actually bartering and trading and getting

14   things of value.

15             Now, I understand the government disagrees, the Court

16   may disagree --

17             THE COURT:  Well, I think you've moved to a different

18   argument.  Right now, I'm just trying to figure out whether the

19   language of the application note, as informed -- the language

20   of the guideline, as informed by the application note, would

21   treat this kind of trading of passwords and access to what each

22   user has in their files, it constitutes a thing of value, as

23   described in the sentencing commission guidelines.  And it

24   seems to me a thing of value means anything of valuable

25   consideration.  For example, in a case involving the bartering

1    of child pornographic material, the thing of value is the child

2    pornographic material received in exchange for other child

3    pornographic material bartered in consideration for the

4    material received.

5           This exchange of passwords, after a brief exchange as

6    to the interests of the users, would seem to be exactly what

7    the application note has in mind.  Do you disagree with that?

8           Your response is that, well, we shouldn't be following

9    the guidelines, that the guidelines are, for a number of

10   reasons, not appropriate.  We'll get to that argument in a

11   minute.  But in terms of just interpreting the language here,

12   are you suggesting that this isn't an exchange of child

13   pornographic material through the exchange of passwords?

14           MS. CROSS-GOLDENBERG:  I'm saying, Your Honor, that in

15   light of the guidelines as a whole, and in light of the actual

16   facts of this case, I don't think the application of that

17   enhancement is appropriate here, and neither did probation.

18           THE COURT:  Well, without an explanation.  Probation

19   didn't really explain anything.

20           MS. CROSS-GOLDENBERG:  Well, the government, as -- I'm

21   not sure, I'd have to go back to the end of the presentence

22   report, but I don't think they objected at the time, and so I

23   don't think there was a call for probation to explain that any

24   further.  And so -- you know, this is how a presentence report

25   normally reads, unless there's reason for them to further

1    explain something.

2              THE COURT:  But, look, I'm not bound by probation's

3    view on this, and so I think the issue is -- I think this is

4    teed up now, I don't think the government's waived the

5    argument.  It's certainly in their sentencing submission to me.

6    Look, I think a fair reading of the guideline language and the

7    application note makes clear that what went on here would fall

8    under the definition of thing of value under 2G2.2(b)(3).  So I

9    think the enhancement is warranted under the guidelines.

10             So with that finding, then, we are at 18 plus two,

11   plus five, plus four, plus two, plus five, is, I think, 36.

12   Yeah, 36, minus three for acceptance, puts us at level 33.

13             There's no dispute that Mr. Bennett is in Criminal

14   History Category I, so according to the guidelines, the range

15   is 135 to 168.  That's about 11 years to 14 years or so.  So 11

16   to 14 years, which is a long time.

17             Now, this is only one factor.  There are other factors

18   to be considered, and I know Ms. Cross-Goldenberg has arguments

19   about what sort of weight should be given to these guidelines.

20             I should say up front -- I don't want to prolong the

21   agony, and I think expectations matter in some ways, important

22   ways -- that I generally think that these guidelines are not

23   barbaric at all.  I think what's truly barbaric is the images

24   on these videos.  We're talking about small children being

25   raped, viciously raped, others being abused in ways that are

ECJKBENS

less violent perhaps, but are still clearly abuse, and we're talking about not just a few of these, we're talking about dozens, hundreds, thousands of these images that were not just possessed, not just viewed, but shared as part of a network. Really, that's what the sharing software and these chats are designed to do, to enable people to find like-minded individuals to share this kind of material.  This is brutal, and there are real victims to this, and I think nobody could watch this and not know that there are real victims to this. And I think a society has to be able to articulate outrage and has to be able to seek some deterrence, both individual and more broadly general, to send the message this just can't be tolerated.

        So I have to say, I'm not even sure that a below-guidelines sentence is appropriate.  I know there are a lot of other factors to discuss, and I say that respectfully because I think that Mr. Bennett is in many ways a very admirable man and a talented man, but this crime is a pretty terrible crime.  Mr. Bennett could have been charged with something far more serious that would have mandatory minimums perhaps.

        So, in any event, I just want to give you a sense as to where I'm starting from.  I think it's only fair to do that. I don't want people to be shocked at the end of the process because this can be a very emotional process, and I understand

ECJKBENS

1    that.

2            So, Ms. Cross-Goldenberg, I'm happy to hear from you

3    on any of the points raised in your submission or elsewhere.

4            MS. CROSS-GOLDENBERG:  Yes.  Can I just have a moment?

5            THE COURT:  Absolutely, sure.

6            (Pause)

7            MS. CROSS-GOLDENBERG:  Thank you, Your Honor.  And I

8    appreciate the Court laying out its instincts at the outset.

9            I do have many things I want to say.  I know I've

10   already submitted a lengthy submission, but there is a lot to

11   say about this young man.  And I know the Court has heard not

12   just from me, but from his friends and family, and I hope that

13   the Court can recognize that this sort of case, in particular,

14   is the kind of case where an arrest and exposure can plummet an

15   individual further into depression, further into isolation and

16   loneliness, and can lead to further danger to the community and

17   problems down the road.

18           And what we have in this case, I think, is a very

19   stark example of where the opposite occurred.  Mr. Bennett was

20   able to disclose his conduct to the people closest to him.

21   They supported him in his recovery efforts, and they continue

22   to be here today to support him, which is not something that

23   everybody in his shoes has going for them.  And I think, in

24   terms of the Court's instincts and society being entitled to

25   articulate its outrage and seek some return for the conduct, I

ECJKBENS

think they are one of the things that sets this case apart,

because they demonstrate that Mr. Bennett's rehabilitation,

which had already begun prior to his arrest and prior to his

incarceration, will continue once he is released from custody.

I want to highlight some of the points in my letter,

Your Honor, but as the Court knows, based on all of the factors

to be considered under Section 3553(a), our position is that a

sentence of three years' probation is the just and appropriate

sentence in this case, and that any further term of

incarceration would be greater than necessary on the individual

facts of this case, and as they relate to Mr. Bennett, would be

greater than necessary to achieve the statutory sentencing

objectives.

I want to start with his history and characteristics,

Your Honor, because there are really two sides to him.  And I

gave the Court a very lengthy bio in my sentencing submission,

I'm not going to recap all of it, but I think the summary is

that Mr. Bennett was really exposed to two different worlds as

a child.  He was exposed to two different worlds that could not

be reconciled.  When he was with his mother, it was a very

church-going, orderly, rule-based world, that he was able to

navigate and thrive in.  And when he was with his father, it

was a much more lewd, highly sexualized atmosphere that

involved liquor stores, and sex shops, and the homes where his

father was having affairs.  And that dichotomy is something

ECJKBENS

1    that sort of has persisted with Mr. Bennett, and it really

2    hasn't been something he has been able to delve into until he

3    got into treatment.

4         And I think the sort of stark difference between those

5    two worlds is highlighted in the letters from his parents that

6    I attached to my submission.  His mother's letter is very

7    detailed, very not just supportive, but clearly reflects how

8    close she is to her son and how well she knows him, whereas his

9    father's letter doesn't really acknowledge any of these things

10   from Mr. Bennett's childhood that may have led to issues and

11   sort of says, well, we played basketball together, I don't know

12   why -- I don't know where things went wrong.  And I think that

13   does kind of reflect the difference in the two worlds that he

14   was living in.

15        Mr. Bennett's life stabilized somewhat when his father

16   got remarried, but he still was living between these two

17   worlds.  And as is detailed in Dr. Bardey's report, he did

18   suffer abuse as a child, and that is something that he has not

19   been able to face or reconcile until he entered treatment

20   following his arrest here.  He basically had to shut down any

21   of the pain that he faced, pretend he didn't face it, and

22   really pretend that he was this successful, smiling, cheerful

23   person who was getting along fine in life.

24        I think the government's submission really captures

25   what has been missed here in this case.  The government sort of

says, well, he overcame all this stuff, he never should have

ended up here, and that's just the point, that he didn't

overcame all this stuff, and he didn't have a means to overcome

it because he never had an outlet, he never had the treatment

or the therapy that permitted him to overcome it.

        And I think it was the shock of the search on his

apartment in February of 2013, of his arrest in October of

2013, and the help of treatment that he was receiving that

would really have allowed him to be rehabilitated, and

deterred, and to be in a place where he can move on and not be

a risk to anyone.

        That is -- as I said, that's a brief summary, right.

The Court knows about his achievements, all the good things.

And I think they are important here, because it does show

Mr. Bennett's potential.  And, again, as I said, this is the

kind of case where an arrest or exposure can sort of plummet

someone into darkness.  I think the Court has before it

Mr. Bennett's track record of perseverance and dedication to

his goals.  And his goal here is, and has been, to get

everything he can out of treatment and to continue to live a

law-abiding life, and that's what he did for the 18 months

before he was incarcerated.

        With respect to the nature and circumstances of the

offense, Your Honor, we detail in our letter the circumstances

that Mr. Bennett found himself in when he was first introduced

ECJKBENS

to GigaTribe.  He was living this -- he was sort of maintaining

this dual persona, this dual role of the person trying to lead

the perfect life or that appeared --

THE COURT:  You said 18 months before he was

incarcerated?

MS. CROSS-GOLDENBERG:  Yes, Your Honor.

THE COURT:  He was arrested -- I thought he was

arrested on October 22nd, 2013.  You're saying before that, he

had --

MS. CROSS-GOLDENBERG:  Yes, Your Honor.  The search in

this case took place in February of 2013, the search that

recovered the child pornography.

THE COURT:  Okay.

MS. CROSS-GOLDENBERG:  At the time of his arrest,

there was a subsequent search, a subsequent seizure of his new

computer, of his new electronic devices, and there was no child

pornography found on them.  That's, I think, a huge factor that

sets this case apart from many others, and I'll go into that a

little bit more as I talk about his progress through the case.

But as I said, he was trying to sort of present the

persona of someone who was leading the perfect life, but the

reality was, he was ill-equipped to deal with the hardships

that piled on him at that time.  He had his crushing law school

debt.  He's a Harvard law graduate who can't find a job, which

is an incredibly hard thing to sort of face the outside world

ECJKBENS

with.  His grandmother and his grandfather passed away in very

short succession.  His mother was diagnosed with cancer.  He

was broken.  And that's not any kind of excuse, but to the

extent the Court needs to consider the nature and circumstances

of the offense, that that's where he found himself when he was

introduced to GigaTribe.  He was flailing.  He did seek

treatment for depression, but there is no doubt that this was

like the low point of his life.

His offense conduct, as the Court has already spent

some time discussing, consisted of using the GigaTribe program,

which is a peer-to-peer file-sharing, password-protected

software, and he accessed and downloaded child pornography

using that site.  He shared his password with other people,

with other users, including, obviously, the undercover, which

is what led to his arrest in this case.

And I think in his letter to the Court, which I hope

the Court has spent some time reviewing, he explains to the

Court that at that time, when his life was spiraling out of

control, the computer seemed to be something that he could

control, and what he accessed or what he did with his computer

was a proxy for sort of the flip side of the loss of control

over everything in his life.

I say that, again, not to make excuses and not to say

that the Court should excuse any behavior, but it's critical, I

think, for the Court to understand where he was at the time,

ECJKBENS

1    because he's no longer there.  And I'll talk about that in a

2    couple of minutes.

3              But with respect to the nature and circumstances of

4    the offense, Your Honor, yes, he accessed, and downloaded, and

5    saved the child pornography that he -- or some child

6    pornography that he viewed on the program, and he shared his

7    password with other people so that they could do the same.

8    Now, we don't know, and I don't think we can ever know, and I

9    don't think certainly the government can prove, what child

10   pornography -- my understanding of these sort of circles is

11   there's a limited amount of child pornography, and I don't

12   think there's any reason -- we don't know what new child

13   pornography he exposed other viewers to or what, by trading

14   passwords, he gained or he was able to give to someone else.  I

15   think it's clear from the chats, as I said, that it was very

16   sort of bang, bang, like what's your password, what's your

17   password, what's your password, not particularly -- although

18   occasionally, there were maybe a couple of conversations, but

19   not -- the bulk of the conversations are not about specific

20   things.

21             And, in fact, there are other chats that talk about

22   meeting up with kids or what people -- how people are going to

23   entice kids to do things, what people -- telling stories about

24   what people do or want to do with kids.  That's all in what the

25   government submitted, and Mr. Bennett played no part in that.

ECJKBENS

He doesn't answer when people suggest things like that, he
doesn't even respond to those sorts of comments or ask any
questions.

         Your Honor, yes, he gave away his password, bartered
his password, if that's what the Court wants to call it, but
that doesn't make him anything more than a voyeur in this case.
And I think what the Second Circuit set up in Dorvee, to
contrast a voyeur being someone who looks at these images from
a predator or someone who would actually go beyond the images
is the important question.  And nothing in the government's
submission changes the fact that Mr. Bennett was a voyeur, that
he was looking at these images, and there is nothing to suggest
that he went beyond that in the sense that he actually would
take any action or take any steps to create child pornography,
to manufacture it, to sell it, or the next step, to actually
entice a child, or meet a child, or hurt a child.  There is
nothing that indicates that that was going on, or that would go
on, or that's something the Court needs to worry about in
factoring a sentence.

         There were some reactions to his collection.  People
asked him questions like, is that it?  It's not a lot, it looks
commercial, which I take to mean like it's not homemade, like
you haven't made any of this stuff.  And so I think in terms of
the gradations of what occurs in these types of chat rooms, as
I said, there's nothing that changes Mr. Bennett from a voyeur

ECJKBENS

1    to something worse.  He didn't manufacture these images, he

2    didn't sell them, he didn't buy them.

3             I don't want to minimize the content, and I don't want

4    to minimize the outrage that the Court feels that these images

5    exist, or that people watch them, but the fact of the matter

6    is, the hard part of sentencing is, we have to distinguish the

7    circumstances of Mr. Bennett's case from the circumstances of

8    other cases.

9             As I mentioned when we were talking about the -- well,

10   actually, I'm not sure I have to go over that again.

11            What I think is critical here, Your Honor, is

12   Mr. Bennett's response to law enforcement intervention.  And

13   that, I think, is something that sets this case apart certainly

14   from any of the cases that were cited by the government in its

15   papers and even from most of the cases that were cited in our

16   papers, is Mr. Bennett's response to the police intervention,

17   and I think this is something that's highly relevant to the

18   appropriate sentence here.

19            As I mentioned, the initial search took place in

20   February of 2013, and as the Court can see from Exhibit F to my

21   sentencing submission, even before he was charged in the case,

22   even before he was charged with the crime, even before he had

23   an attorney, he was corresponding with the government over his

24   property that had been seized because my understanding is,

25   multiple devices were seized that did not contain child

ECJKBENS

pornography.  So as was his right, he was attempting to get

those back.  And he said to them -- he described that the

search of his apartment had been a turning point in his life,

that he had to explain to his mother what he had done, and what

he had been doing, and that that was a nightmare.  I cannot

imagine having a conversation like that with my mother.  And

that he saw the intervention of the authorities as a blessing,

and he had made changes.

         The government -- I'm not really sure what they're

getting at in the submission where they want to try to nitpick

that he didn't sort of write out a full confession that he

stuck to right from the beginning of the search.  The important

thing for sentencing purposes is that he stopped looking at

child pornography.  That's the important thing.  That's what

this sentence largely has to be directed at, how can we deter

Mr. Bennett, how can he be rehabilitated, how can you protect

the public, all of those things.

         THE COURT:  There are other things, too.  There's just

punishment.  That's part of it, too.  There are victims here,

and people possessing child pornography of such a violent

nature is a crime for a reason, right?  It's not just about

Mr. Bennett's personal journey here, it's about punishment for

a crime that is an incredibly serious crime with real victims.

So just punishment is also part of the equation, right?

         MS. CROSS-GOLDENBERG:  Right.  Just punishment, Your

ECJKBENS

1   Honor, not just punishment.  I mean not only punishment, right,

2   just punishment.

3          THE COURT:  That's true, the transcript might be

4   confusing.  A just punishment as in one that is just, yes.

5          MS. CROSS-GOLDENBERG:  And I think that's kind of

6   where the guidelines here get lost, and I think that's kind of

7   where the government's submissions comes off the rails because

8   it just focuses on that somehow a lengthy jail sentence is the

9   thing here, but it's not tethered to any of the purposes of

10  sentencing.  There's no reason to think that a lengthy jail

11  sentence leaves society safer, or provides better

12  rehabilitation, or provides better deterrence for anyone, or

13  promotes greater respect for the law, in fact.

14         So I think -- I'll talk a little bit more about the

15  guidelines and the types of sentences available, but I think

16  that's important to consider here, that it's impossible to

17  consider a just punishment without considering its effect on

18  Mr. Bennett.

19         THE COURT:  Clearly.  That's part of the equation.  My

20  point was simply that there are other factors as well, not just

21  the ones that you mentioned.

22         MS. CROSS-GOLDENBERG:  So, Your Honor, look, I know

23  the government attached not the notes, but the writeups of

24  Mr. Bennett's statements to the authorities.  And, yes, when

25  his apartment was searched in February of 2013, that was about

ECJKBENS

1    a week before he was scheduled to take the bar exam, and was he

2    freaked out, and was he candid, did he confess at that time?

3    He was completely freaked out, he was terrified, he panicked,

4    and he didn't come clean about what he had done.  But that

5    doesn't, I think, in any way counsel toward how many months he

6    should spend in jail, because the key is, he didn't go back to

7    looking at child pornography, which is, of course, the behavior

8    that we're trying to avoid here.  He did express his remorse,

9    as I said, when he wrote to the authorities regarding his

10   property.

11              Eight months later, when he was jolted out of bed on

12   the morning of his arrest, and his apartment was stormed over,

13   something that he thought was behind him -- understandably, it

14   had been eight months -- he hadn't done anything else wrong, he

15   hadn't heard from any authorities, yeah, he was, again,

16   disheveled and sort of freaked out, and, quite frankly, he was

17   treated very disrespectfully and rudely.

18              Now, I don't necessarily expect the Court or the

19   government to care about that, but --

20              THE COURT:  Well, I care about it.

21              MS. CROSS-GOLDENBERG:   -- in terms of his mental state

22   and his mindset at 6:00 in the morning, when the authorities

23   are storming his apartment, they didn't read him his Miranda

24   rights, they mocked him for being an attorney and said you

25   should know your rights.  And, in fact, I know the government,

ECJKBENS

1    as I said, included the typed-up 302s, but on the handwritten

2    notes, you can sort of tell, it's like squeezed in at the very

3    top of the page, like, oops, we forgot to say, we read him his

4    Miranda rights, so it's handwritten at the top of the page.

5          He was mocked as a Harvard graduate, and he was told

6    repeatedly by the agents how much pleasure the government was

7    going to take in bringing him down a notch and how everybody

8    was going to love to see his fall from grace.  That was what he

9    was going through that morning.  So, in that environment, did

10   he fully come clean?  No.

11         And this was just a continuation of sort of the

12   rudeness that I think I talked about the last time we were here

13   that happened during the search, where -- and I apologize, but

14   I think it's necessary to put in context -- the agent said,

15   show us your dick, we have to compare it to the pictures we see

16   here, and then they said, ha ha, just kidding, we like to keep

17   it light.  Okay, if we're talking about a person's mental state

18   at that point, right, I think it's understandable why there

19   aren't -- there's not a full expression of remorse.

20         But what I do think is interesting is that the fact

21   that he hadn't confessed his conduct ate at Mr. Bennett that

22   whole day, and, in fact, as is reflected in the government's

23   exhibit, he was the one who called the agents to his holding

24   cell and said I want to talk and admitted his conduct.

25         Now, there's certainly no requirement that a person

ECJKBENS

confess on the day of their arrest in order to be deemed to

have accepted responsibility, certainly not before they've met

with an attorney or even been presented in court, but I think

what's really, really important about that day, the day of his

arrest in this case, is, as I said, what the government or what

the agents did not find in his apartment, which was child

pornography.  They did not find any additional evidence that he

had reinstalled or, I guess, that he had installed GigaTribe on

his new computer, that he had downloaded it, or accessed it, or

viewed, or anything child pornography.  And so that is

critical, because when you step back, and you say, okay, a

person who wasn't even charged with a crime went these eight

months not knowing he was being watched, not knowing -- not

being under the supervision of a court, that person was

deterred, was rehabilitated, continued to obey the law, and

then you throw in the arrest and the behavior that he

demonstrated for the 11 months following his arrest in terms of

complying with the terms of pretrial supervision, being on the

ankle bracelet, and not just -- I say complying, but really

thriving in a way that I continue to consider exceptional.  He

had two jobs, he was working at two different higher education

institutions, and I attached some of the student and faculty

evaluations that he received to my letter, and he was excelling

in treatment.  His treatment provider said that he was

really -- he was committed to it, and he was really making --

ECJKBENS

1    he was really making strides at recovery.

2            And all of that -- he had 11 months to sort of

3    demonstrate that.  The rug was pulled out from under him on all

4    of that on the day of his guilty plea and in ways that I think

5    contradict the goals of sentencing.  He was forced to resign

6    from his jobs in the robing room back here, which was

7    completely gut-wrenching and probably precluded him from going

8    back to those jobs whenever he is released, because he wasn't

9    permitted to resign in a way that gave his employers any kind

10   of notice.

11           He had to leave his -- well, I'll get into that in a

12   second, but I want to focus on the treatment, which was

13   something that we talked about quite a bit that day, and it

14   wasn't the kind of situation, as we often see in these cases,

15   where someone is compliant to the extent that they attend

16   treatment, they show up when they're supposed to show up.  And

17   I think that the reports, at least that we were able to get

18   from pretrial -- I don't know why we weren't able to get all of

19   them -- but the reports that we were able to get indicate that

20   he was excelling, thriving in treatment.  And I think this

21   corresponds with Dr. Bardey's report, and it really underscores

22   what Dr. Bardey concludes when he told the Court that the

23   conduct at issue in this case was really a product of some

24   unresolved psychological matters that Mr. Bennett can address

25   through therapy, that there was no escalation in his behavior

ECJKBENS

that would indicate that he is a danger to the community or to

anyone else, that his viewing of child pornography on the

computer, as serious as it is, was an end to itself, it was not

a window to any other kind of conduct, it wasn't a portal to

anything more dangerous, and that there is no evidence that he

poses a risk to anyone or that he himself is sexually

dangerous.

        And I think that's critical, Your Honor, because

probation and the government both, without any basis, question

these findings.  But they ignore the fact that Dr. Bardey

had -- he had the complaint in this case, which listed and

described the titles of some of these videos, and it's not a

situation where the complaint was sanitized, and it didn't

really get to the heart of what was there.

        But, more importantly, they ignore the fact that

Dr. Bardey subjected Mr. Bennett to objective testing.  So it's

not just like they sat down and had a conversation, and that

Mr. Bennett was somehow able to lie his way out of everything

important, and then Dr. Bardey reached this erroneous

conclusion, right.  His report explains the testing, and the

procedures, and the objective measures, which the subject,

Mr. Bennett, who's taking the test, is unaware of how they're

being evaluated, so there's no way to sort of manipulate the

outcome of those tests.

        And I think the argument that the government, and

ECJKBENS

1    probation, and I think, to some extent, the Court in its

2    initial comments seem to be making is that based on the name of

3    the video or the content of the video that goes from bad to

4    worse -- it's all bad -- that that somehow reflects the length

5    of the jail sentence that a person should receive, and I think

6    that's just not borne out in science, in medicine, or in any

7    kind of theory of punishment.  The issues --

8         THE COURT:  I don't understand what the science of

9    just punishment is.  The nature of the crime, the violence

10   depicted in the videos, seems to be relevant to the punishment

11   imposed.  I'm not sure what science can add to that analysis.

12        MS. CROSS-GOLDENBERG:  Well, in terms of the

13   appropriate sentence, Your Honor, so not just -- I guess my

14   point is that I think this is the kind of sort of hysteria that

15   led Congress to intervene in these guidelines and these

16   assumptions that if you look at this kind of video, that means

17   you're a risk, or that means you pose a danger of abusing

18   children, or you're a pedophile.  That's where I'm talking

19   about the lack of science.  It's just sort of a hysteria around

20   this stuff sounds really, really bad, you must be very

21   dangerous, and there's just no link there.  And Dr. Bardey's

22   report, I think, to the extent that there is in some cases,

23   makes clear that there is no link in this case.

24        THE COURT:  I didn't understand the government to be

25   suggesting that Mr. Bennett was a danger.

ECJKBENS

1          Are you, Ms. Choi?

2          MS. CHOI:  No, Your Honor.  And I think a lot of what

3  Ms. Cross-Goldenberg -- and I don't mean to interrupt her -- a

4  lot of her arguments in submission to the Court were made to

5  the government in its evaluation of the charging decisions in

6  this case and led to the result that did occur here.  The

7  government doesn't suggest that there is any evidence of that.

8          THE COURT:  I just wanted to make sure.  I didn't

9  remember anybody suggesting that.

10         So, anyway, go ahead.

11         MS. CROSS-GOLDENBERG:  So, Your Honor, I think with

12 respect to the issues like recidivism, risk of recidivism, risk

13 of danger, that sort of thing, the content of the videos don't

14 shed any light on that, on those issues, and neither do the

15 titles, or even, quite frankly, the number of the videos.

16         So I think, to the extent that probation or the

17 government questions Dr. Bardey's report, there's really no

18 basis to do so.  It sort of ignores not only the information

19 that he looked at, but the objective nature of his evaluation.

20         And I think, unfortunately, it's the same kind of like

21 reflexive, the stuff sounds really bad, you must be dangerous,

22 even if the government is not making that argument today, it's

23 that sort of thinking that led to Mr. Bennett's remand in this

24 case and that the Court felt constrained by Congress to remand

25 him.

ECJKBENS

1          THE COURT:  There's a law.  There's a law that says

2     people -- the presumption is that they go to jail once they

3     have pled guilty to certain crimes, and it's more than a

4     presumption for certain crimes.  So it's only truly exceptional

5     circumstances that would allow one to not be incarcerated

6     pending sentencing.  We have already been through all that.

7          MS. CROSS-GOLDENBERG:  My point, Your Honor, is that

8     that law, again, is not based on any actual reason to think

9     that Mr. Bennett is dangerous or needed to be remanded.

10          THE COURT:  Well, that may be, but is your view that

11     Dorvee entitles judges to just override laws that they don't

12     like?

13          MS. CROSS-GOLDENBERG:  No, Your Honor.  I'm talking

14     about, as I said, the hysteria that surrounds these sort of

15     cases and the willingness to make a jump from, this stuff

16     sounds really bad; therefore, we have to get you off the street

17     and put you in jail, that's the way to deal with these cases.

18     And I think that's -- this case is a perfect example of why

19     that's actually counterproductive.  So what we saw on

20     September 5th, when we were here for Mr. Bennett's guilty plea,

21     was that when he was remanded, as I said, he was forced to quit

22     his job, abruptly stop all mental health treatment, despite the

23     government's representation to the Court that he would continue

24     to receive mental health treatment while he was incarcerated,

25     he has received none.  And, in fact, he didn't even continue to

ECJKBENS

1   receive the same medication.  The BOP, they had their own

2   formulary list of what medications they think people should

3   take, and that's all that happened.  His medication was

4   changed, and he never received any treatment.

5          I think, Your Honor, in light of all of these nature

6   and circumstances of this case, the sentence recommended by the

7   guidelines is just completely out of whack with what happened

8   here, with who committed this offense, and with what he will do

9   in the future, and is far, far greater than necessary.

10         With respect to the guidelines, Your Honor, I don't

11  want to go over all the legal arguments.  I know the Court has

12  read Dorvee, I know the Court has read my submission.  I think

13  it's beyond dispute that this guideline, 2G2.2, is seriously

14  flawed.  The Second Circuit cautioned that it can lead to

15  unreasonable sentences that actually contradict Section

16  3553(a)'s mandates, which is a point that I have been trying to

17  reiterate, and they're just not entitled to deference in this

18  case.

19         THE COURT:  I never suggested that they were entitled

20  to deference, so they're certainly not entitled to deference.

21  Well, they are entitled to some consideration under 3553(a),

22  and under Supreme Court precedent, they're entitled to some

23  consideration, but they're not entitled to deference at all.  I

24  get that.

25         And I've read Dorvee.  I understand why some guideline

ECJKBENS

1   sections are entitled to less consideration than others.  I get

2   that, too.

3         MS. CROSS-GOLDENBERG:  Right.  And I think in this

4   case, Your Honor, it's clear that the guidelines are not

5   empirically based, that there's nothing, again, that tethers

6   these sorts of enhancements that were required by Congress to

7   any sort of a theory of punishment as to why this number of

8   months should correlate to this kind of enhancement.

9         And I think, as I mention in my letter, the

10  commission, in its expertise, when it set the base offense

11  level for this kind of case, it thought the base offense level

12  should be between six and ten, depending on different

13  characteristics.  If you look at that, even putting aside

14  Mr. Bennett's acceptance of responsibility, a level 6 would

15  give us a guideline range of zero to six months, and a level 10

16  would give us a guideline range of six to twelve months.

17        THE COURT:  Right.  But that's with no enhancements,

18  though.  You can't have it both ways.  You can't say that the

19  commission suggested a base offense level of this, and so we'll

20  take that and disregard any enhancements that would have

21  otherwise been applied.

22        MS. CROSS-GOLDENBERG:  Well, the enhancements, Your

23  Honor, are part of the problem.  It's not just the base offense

24  level, but the enhancements, as the Second Circuit said --

25        THE COURT:  I get that, but you're invoking the

ECJKBENS

1    commission's base offense level for your purposes, but then

2    ignoring the rest of what they initially would have done and

3    then ultimately didn't do.  But, look, I understand the point.

4            MS. CROSS-GOLDENBERG:  But that's not exactly right,

5    Your Honor, because the commission didn't want to do these

6    enhancements.  Congress told them they had to.  This was the

7    only instance where Congress directly intervened and amended

8    the guidelines.

9            THE COURT:  Your view is that the sentencing

10   commission believed that there should be a base offense level

11   of six to ten and nothing else for these kinds of crimes.  Is

12   that what you're suggesting?

13           MS. CROSS-GOLDENBERG:  Not necessarily that there

14   should be nothing else, but when you look at, as has the Second

15   Circuit said in Dorvee, the factors that lead to enhancements

16   in this case are the sorts of things that are inherent in the

17   offense.  So should there be a two-level enhancement for using

18   a computer?  No, because that's how people access child

19   pornography in this day and age.  That is inherent in almost

20   every offense.  Should there be an enhancement for, for

21   example, the sadomasochism, the four levels?  No, that's

22   something Congress ordered them to do, and it is inherent, as

23   the Court said, essentially in every one of these kinds of

24   cases.

25           THE COURT:  I don't agree with that, that it's

inherent in all these cases, that there is a violent rape of a

child in which the child is penetrated by an adult while

screaming, and crying, and trying to get away?  That's not

true.  I've had enough of these cases to know that that's not

true in every case.  That's not inherent by any means.

So there are different types of images that fall under

the header of child pornography, but some are clearly more

violent than others, and I can't say that it's unreasonable to

make a distinction between the truly violent and the other

types that don't involve overt acts of violence.

MS. CROSS-GOLDENBERG:  Well, that's one thing, Your

Honor, but that's, unfortunately, not what 2G2.2 does.  And in

my experience, that's not, you know, the government's position,

that if it's a child, it's inherently -- this is an inherent

characteristic because of the age of the child, and so I think

that's one of the things that the Second Circuit specifically

spoke to.

The third point I would make, and this is what I was

getting at earlier, is that's clearly exhibited in this case,

that a literal interpretation of 2G2.2 leads to the irrational

result where you cannot differentiate repeat offenders from

first time offenders, you cannot differentiate predators from

voyeurs, you cannot differentiate, as the Second Circuit says,

commercial distributors from the run-of-the-mill user.  There's

no question here that Mr. Bennett is a run-of-the-mill user.

1    Yes, he shared his password, as everybody else on GigaTribe was

2    doing, but he was not a commercial distributor, he did not

3    manufacture this stuff, he did not sell it, he did not create

4    it, he did not even fantasize about doing so, let alone talk to

5    people about how that might be possible or arrange to set up

6    meetings.

7            I think another example of this is that the Court sort

8    of did the math in terms of, again, the congressionally ordered

9    number of images, and there are 79 videos on Mr. Bennett's

10   computer, and then when you multiply that by the 75 images, you

11   get like 5,000 images, which makes it sound like there are

12   5,000 victims, right, which there weren't.  It's not to

13   minimize what happened to the individuals in the videos and in

14   the images, but the difference of going from a couple of

15   hundred people to five or six thousand, it just makes it seem

16   so much worse.  And, again, that's the highest level

17   enhancement that there is.  So there's no way to differentiate

18   someone who's in Mr. Bennett's situation from someone who

19   actually had 6,000 videos with 6,000 different victims.

20           As I said, the guidelines, as the Court and the

21   government calculated them, leave us with a top of the

22   guidelines, four years over the statutory maximum, and I think

23   that just shows how we can't just apply them and pay them any

24   deference.

25           Your Honor --

ECJKBENS

1          THE COURT:  But there's a mandatory minimum that could

2     have applied here, right, in a case that has a longer statutory

3     maximum?  So I think that's worth considering, that Mr. Bennett

4     could have been charged with a statute that had a ten-year

5     mandatory minimum, correct, Ms. Choi?

6          MS. CHOI:  Your Honor, a five-year mandatory minimum

7     and the statutory maximum would go up from ten to twenty, Your

8     Honor.

9          THE COURT:  Okay.  So it's worth considering, but I

10    think I understand all this.

11         MS. CROSS-GOLDENBERG:  So, Your Honor, this brings us

12    to the type of sentence that the Court can impose.  And I think

13    3553(a) directs the Court to consider not just imprisonment,

14    but other types of goals of sentencing and outcomes of

15    sentencing, and I think Dorvee makes it clear in a case like

16    this, the Court can fashion a noncustodial sentence.

17         THE COURT:  But Dorvee, just so it's clear, on remand,

18    got over ten years.

19         MS. CROSS-GOLDENBERG:  And his conduct was very

20    different, I think, than the conduct here, but I'm talking

21    about in terms of the Court's authority.  It's clear --

22         THE COURT:  I'm certainly aware of my authority, no

23    question about that.

24         MS. CROSS-GOLDENBERG:  And I think, Your Honor, the

25    Court -- again, in looking at the facts of this case and saying

ECJKBENS

what gets us to the goals, what satisfies the ends of

sentencing, what gets us to the goals of 3553(a), the Court has

to take into account all aspects of the punishment that

Mr. Bennett has faced as a result of this case, because it's

not just jail time that can punish or reflect the seriousness

of a case or provide deterrence and the other factors.  In this

case, Your Honor, Mr. Bennett voluntarily informed the Maryland

bar authorities of the charge and of his plea.  He informed

them of the charge prior to his plea, and then informed them of

his plea.  He consented to disbarment.  He entered an order

with them consenting to that despite, again, the crushing

student loans that remain.  He now will not be able to practice

as an attorney.

          As I mentioned, his abrupt remand, his resignation,

leaving his students high and dry, leaving the institutions

where he was teaching high and dry --

          THE COURT:  Well, he didn't tell them of the charges,

right?

          MS. CROSS-GOLDENBERG:  Well, there was no requirement

that he do so.

          THE COURT:  Well, no, but the point is, you say he

told the bar about those things, but --

          MS. CROSS-GOLDENBERG:  Well, there's a requirement

that he do that.

          THE COURT:  I thought you said there was no

ECJKBENS

1    requirement that he tell them about the charges, simply that he

2    tell them about the plea.  Am I wrong about that?  To the

3    extent he told people what he was required to tell them, I

4    guess I wouldn't entitle that to great credit, but to the

5    extent he told people things he wasn't required to tell them,

6    that would be -- I thought that was the point you were making.

7              MS. CROSS-GOLDENBERG:  Right.  With respect to the

8    bar, that he voluntarily -- it's not like they had an inquiry

9    and said tell us about this or what's happening in your case.

10   He reached out to me and said this was something he wanted to

11   initiate, and then we figured out a way to make that happen.

12   It took some time because I'm not an attorney in Maryland, and

13   I've never dealt with the Maryland bar council, but that was

14   something that was important to him that he do even before he

15   pled in this case.

16             Your Honor, another punishing aspect of that day in

17   September, I think, as we mentioned, Mr. Bennett's mother had

18   just left for a mission to South Africa, I think a church

19   mission to South Africa the morning of his plea, and he had to

20   just leave her a voicemail saying I'm going to jail, knowing

21   that she wouldn't get it for weeks until she returned to the

22   States and could access his voicemail.

23             It's not something I expect the Court to feel sorry

24   for him or for her about, but I think it is relevant, because

25   these are the kinds of things that can act as a deterrent to

ECJKBENS

1    future misconduct, and they're the kinds of things that are

2    certainly not considered by the guidelines, and that's why I

3    think they're relevant.

4           Similarly, not even having had an opportunity to pack

5    up his own apartment, not being able to close his bank accounts

6    or take care of things that will hurt his --

7           THE COURT:  I'm not sure why you keep saying he didn't

8    have these opportunities.  The law was the law.  It's not like

9    it got sprung on people the day of his guilty plea.  So the

10   fact that he wasn't expecting it, I don't know what to say

11   about that, but certainly the law was unchanged for many years

12   before Mr. Bennett's guilty plea.  He could have taken steps to

13   prepare for the at least possibility that he was going to be

14   remanded as the law requires.  It seems to me you're trying to

15   argue that that shouldn't have happened, which I'm not sure why

16   it's necessary to do that at sentencing, but I think it's

17   taking us back to many of the arguments that were made on the

18   day of the plea.

19          MS. CROSS-GOLDENBERG:  Your Honor, as I said, I'm not

20   asking the Court to feel sorry for him, and obviously the Court

21   can't go back and change its mind now, I'm not trying to

22   reargue it.  What I'm saying is it is relevant, and it's the

23   kind --

24          THE COURT:  You're saying he didn't have a chance to

25   do these things, and I guess I'm not persuaded he didn't have a

1   chance to prepare his mother for this, or didn't have a chance

2   to pack up his belongings, or didn't have a chance to prepare

3   his employer for these things.  He didn't do those things,

4   which made it more difficult, I suppose, after he was remanded,

5   but he certainly had a chance to prepare those things, he just

6   didn't, right?

7           MS. CROSS-GOLDENBERG:  My point, Your Honor, is that

8   it made it more difficult after he was remanded.  I don't want

9   to argue about whether he should have been remanded.  We're

10  past that point.

11          THE COURT:  I guess the issue you're making is that he

12  didn't have a chance to prepare for these things, and I don't

13  see how one can say that.

14          MS. CROSS-GOLDENBERG:  Well, Your Honor, we discussed

15  with the Court dozens of cases where people had been left out

16  in much different circumstances.  And even since Mr. Bennett's

17  remand, other judges in this district have left out defendants

18  in circumstances that were far less compelling.

19          So I think the fact -- the abruptness of his remand

20  and the problems that it caused are things that the Court can

21  consider, and I think they're clearly not considered by the

22  guidelines, and that's my point on those issues, Your Honor.

23          THE COURT:  Okay.

24          MS. CROSS-GOLDENBERG:  I think the 11 months of his

25  successful compliance, as I said, with treatment and pretrial

ECJKBENS

1    services is critical, and it's perhaps the most frustrating

2    part about that remand, because the treatment is the thing that

3    actually has the potential to affect the goals of sentencing,

4    the rehabilitation, and actually further the other goals in

5    terms of allowing him to get through the issues that led him to

6    this place.

7           And so I think that's important.  And to the extent

8    the Court, I guess, is looking for serious punishment, I think

9    it's appropriate to consider all of this stuff, that punishment

10   is not reflected in the number of months he spends in jail,

11   it's the entire context.

12          I'm going to wrap it up, Your Honor.  When it comes to

13   the goals of sentencing, Mr. Bennett has been deterred.  I

14   think he's demonstrated that, as I said, the 19 months before

15   his remand -- between the search and his remand.  He's been

16   punished both by being incarcerated and in many other ways that

17   are not considered in the guidelines.  He's demonstrated his

18   rehabilitation and that treatment can help going forward.

19   These are all things that protect the community and promote

20   respect for the law.

21          Your Honor, I think there are a number of other

22   sentences in this district where individuals with more

23   aggravating factors have received sentences of probation,

24   either people who have had child pornography found on their

25   computers again at the subsequent search to arrest, people who

ECJKBENS

1    have fled the country after the initial search, people who have

2    been previously investigated for this type of conduct.  And I

3    think -- I'm happy to go through the government's cases case by

4    case, but I know I've already spent a long time, what I want to

5    make clear, though, is the fact that so many people in this

6    district, the Eastern District and the Southern District, are

7    sentenced to sentences that are so far below the guidelines,

8    including probationary sentences, demonstrates that a

9    significant incarceratory sentence, as the government is

10   calling for, and certainly a guideline sentence are not

11   necessary to effect general deterrence because there are plenty

12   of other cases where individuals are sentenced to probation,

13   and that is found to be sufficient.

14          There is no reason to think that anyone other than

15   those of us in this room are going to know what Mr. Bennett's

16   sentence is.  It's not like it's going to be broadcast on

17   GigaTribe.  And so that the notion that somehow sentencing him

18   to more months in jail, despite the fact that he has been

19   specifically deterred, and he has been rehabilitated, there's

20   just no reason for that here.

21          In conclusion, Your Honor, I think it's clear to me,

22   and I hope to the Court, that this is not a case about a

23   predator, it's not a case about someone who intended to be a

24   predator or talked about being a predator, it's not a case

25   about a commercial distributor of child pornography, or about

ECJKBENS

1    someone who manufactured child pornography, or sought out

2    victims, or created child pornography.  This is a case about a

3    broken man, a man who was introduced to GigaTribe at the lowest

4    point of his life, and made the terrible decision to view child

5    pornography, and share it with others via his password.  It's

6    also a case about redemption, and rehabilitation, and

7    deterrence, because the Court has heard evidence in the form of

8    Dr. Bardey's report, Mr. Bennett's postsearch conduct, that

9    show that a further jail sentence is simply not necessary here.

10         In light of all the 3553(a) factors, I think a

11   sentence of three years' probation is just and appropriate, and

12   any further jail time will be greater than necessary.

13         I know Judge Rakoff said in a white collar case, very

14   different circumstances, but that sentencing is the one time

15   where we really do -- sorry, where we really do consider the

16   full measure of a man, all of the good and all of the bad.  And

17   the government says a couple times in its letter that

18   Mr. Bennett shouldn't get special treatment, and he's never

19   asked for special treatment.  And I'm not asking for special

20   treatment on his behalf.  All he's asking for is a full

21   consideration of all of the 3553(a) factors, of all of the good

22   and of all of the bad.  And I think that a consideration of all

23   of his factors, Your Honor, leads to the conclusion that a

24   sentence of three years' probation is the just and appropriate

25   sentence in this case.

ECJKBENS

1      And perhaps the argument that you shouldn't do these

2    when you're pregnant.  I apologize.

3      THE COURT:  No, I understand.  You are an exceptional

4    lawyer and passionate about your clients and passionate about

5    the arguments you make.  I have known you for a long time, and

6    I have the highest respect for you.  That goes without saying.

7    I've said it many times, to the point where I probably do make

8    you blush, but that is the truth.

9      I do want to give the government an opportunity to

10   respond or to make points they believe would be relevant to

11   sentencing.  So go ahead, Ms. Choi.

12      MS. CHOI:  Your Honor, I'll be brief.  I think most of

13   the concerns that the government had with regard to the

14   defendant's position have already been highlighted by the Court

15   itself.  Obviously, all the things that Ms. Cross-Goldenberg

16   has said about Mr. Bennett are factors that should be taken

17   under consideration by the Court, but I think what's important

18   here is that not as much has been said about 3553(a)(6) and

19   (a)(5), which require the Court to determine whether or not the

20   defendant's request for a probationary period would lead to an

21   unwarranted sentencing disparity with regard to this defendant

22   as compared to others with similar records and that are guilty

23   of similar conduct and respect for the guidelines themselves.

24      Now, Your Honor, I want to make clear that the

25   government has never taken the position that the defendant

either manufactured, sold for pecuniary gain, or bought child

pornography.  We have no evidence that he has touched a minor.

If that were the case, he certainly would not have had the

benefit of the discretionary decision by this office to allow

him to plead to a nonmandatory minimum sentence, to allow for a

statutory cap of ten years upon his sentence in lieu of the 20

years.  We would have applied other statutes which also carry

with them other guidelines calculations under those

circumstances.

        But I think -- at its heart, I think the defendant's

arguments boil down to he's a voyeur and not a predator, which

I think for reasons the Court has already explained, doesn't

quite encapsulate the nature of these particular videos under

these circumstances.  And to be clear, these are videos the

defendant chose to download in the first instance by selection

by title.  And I think the titles are illustrative about the

type of abuse, the age of the victims that were abused, the

reactions in terms of pain and what was done to these

particular children, and those are serious considerations, Your

Honor, that you should take into account, especially because

this is not a situation where Mr. Bennett didn't have all of

the -- Mr. Bennett clearly has a network of people who support

him, he's an intelligent individual, I think he knew at the

time he was doing them what he was doing was wrong, and he,

nevertheless, chose to look at those videos, chose to share

ECJKBENS

1    those videos with others on the Internet, and thus, distribute

2    them widely.

3         And I think the Second Circuit's decision in Ryan

4    Gold, which postdates Dorvee, explains why, in the distribution

5    context, there is a specific need for a deterrent effect and

6    why incarceratory sentences are important here, as reflected by

7    Congress' decisions with regard to the guidelines and the

8    statutes, because there is a societal interest in ensuring that

9    this type of behavior does not continue, to not continue to

10   perpetuate a market in which these videos are easily accessible

11   to others, and where that type of victimization can continue.

12        And I think, Your Honor -- I don't mean to belabor

13   this, this is also in the government's submission -- but with

14   regard to the chats and what he did on GigaTribe, I just would

15   like to highlight the fact that the chats that you see are only

16   for November 9th of 2012 to February 6th of 2013, that the

17   defendant himself admitted that he had been doing this for

18   about a year prior to the execution of the search warrant, and

19   that he would install and dis-install GigaTribe at various

20   points.

21        So during that period of time, he traded with at least

22   174 different users of GigaTribe.  This is not a one-off

23   situation where -- as Ms. Cross-Goldenberg noted, it wasn't as

24   though he took one email, sent a video once, and that was the

25   end of it.  This was a continuous course of conduct that

ECJKBENS

1    existed.

2            Just briefly, Your Honor, with regard to the response

3    to law enforcement's intervention and what Ms. Cross-Goldenberg

4    explained were the effects of his arrest, I would note, Your

5    Honor, I have not spoken to the agents with regard to the

6    specific allegations that Ms. Cross-Goldenberg has raised.  I

7    did discuss with them at the time what had happened.  I don't

8    believe that there to be anything that occurred during the

9    course of that arrest is different in terms of the execution of

10   that arrest -- the execution of that arrest versus other

11   individuals, but I would say this:  Defendants are arrested in

12   these types of cases at 6 o'clock in the morning, that's how it

13   is.  I think there is no reason to believe, at least from the

14   government's perspective, that Mr. Bennett doesn't understand

15   or appreciate his offense conduct now that it's been fully

16   briefed, that he's had time to consider what has happened, but

17   I will say that, as the government notes, there were certain

18   statements that Mr. Bennett made even after his confession and

19   his expressions of remorse to the agents in the context of

20   signing his bond in Magistrate's Court, where the case agents

21   weren't there, and it was another agent who witnessed these

22   statements, and I think that moment of candor reflects upon or

23   at least draws into question whether or not the actual arrest

24   itself or the execution of the search warrant had the needed

25   deterrent effect.

ECJKBENS

1           And, Your Honor, there's deterrence not only just to

2    this particular individual, but to the societal message that

3    would be given.  I think, as set forth in the government's

4    submission, significant incarceratory sentences are the norm in

5    these types of cases.  I think I've laid out the average

6    sentence that's imposed for people with no Criminal History

7    Category, with the same guidelines calculations, which would

8    mean similar conduct as that of the defendant.

9           THE COURT:  I've forgotten.  What did you say?

10          MS. CHOI:  Yes, Your Honor.  One moment.

11          I think it's on pages 17 to 18 of the government's

12   submission, which draws from a 2012 Sentencing Guidelines

13   commission report, which indicates two sets of defendants

14   nationwide that had been sentenced to child pornography cases

15   in circumstances that are analogous to this.  One set is with a

16   two-point enhancement, one is with a five-point enhancement

17   that we went through with regard to the type of distribution.

18   And, also, it divides up in terms of defendants that pleaded

19   guilty only to the possession count versus those that also pled

20   guilty to the distribution count.

21          I think the analogous point here is that there are 40

22   defendants that were convicted of possession, but had the

23   five-level enhancement for distribution, the average sentence

24   there was 79 months, Your Honor.  That's not a probationary

25   sentence.

ECJKBENS

1         And I think many of the professional consequences that
2    were attendant to Mr. Bennett's offense conduct here sort of
3    highlight the fact that Mr. Bennett is -- unlike a lot of
4    defendants that Your Honor sees and that we deal with day in
5    and day out in the court, he had the benefit of a support
6    system in his mother and his family, he had the benefit of an
7    excellent education, many things that are not available to
8    other defendants.  And for the very reasons why other
9    defendants should not be more punished as a result of their
10   lack of those opportunities, it shouldn't be the case that
11   Mr. Bennett should somehow be able to say that because of the
12   professional consequences, that was sufficient to mean that he
13   should not have any incarceratory sentence.
14         I don't know if Your Honor has any further questions
15   of the government, I'm happy to answer them, but I think the
16   rest of the government's position is set forth in its
17   submission.
18             THE COURT:  No, I don't have any other questions.
19             Mr. Bennett, we have all been talking about you quite
20   a bit, but, as I said, you have a right to address the Court if
21   you'd like to.  You're not required to, but you certainly are
22   welcome to.
23             THE DEFENDANT:  Your Honor -- I'm sorry.
24             THE COURT:  That's all right.
25             THE DEFENDANT:  There's a few things I just want to

ECJKBENS

1    say very quickly.

2              The first thing that I want to say is that I'm very

3    disappointed in myself.  I'm disappointed because I have to

4    stand here with my family behind me.  My mother gave so much to

5    me.  I don't want her to think this is how I'm going to repay

6    her.  I know this is not what my statement should be about, but

7    I want my mother to know that there's nothing different she

8    could have done, she gave me everything I could have ever asked

9    for.  I did this.  I knew when I did it, that it was wrong.  I

10   apologize to my mother.  I will get out one day, and I want her

11   to know that I'm sorry.  This is not a reflection on her

12   parenting, this is not a reflection on anything that she could

13   have protected me from or shielded me from.

14             I want to apologize to Ms. Choi for being a part of

15   this.  To really just be candid, I want to apologize for even

16   what I said afterwards.  Your Honor, perhaps I deserve it, but

17   there were a lot of things that were said about my background,

18   about what they would do to me in prison, about how far I had

19   fallen and how much of a disgrace I was, about who goes to

20   Harvard Law School and comes out and does this, and I reacted

21   on that.

22             I know that I've done wrong.  I'm embarrassed because

23   I did have the chance to go to schools like that, and I know

24   that there are other people who probably deserved it more than

25   me and would have probably made more out of it.  One day I know

ECJKBENS

1    this will get back to both Morehouse and Harvard, and I want it

2    to be known that I was flawed before I even went there, and

3    those degrees didn't change that and only masked it to some

4    degree.

5            I apologize to the girls and boys who I watched in

6    those videos.  They were disturbing -- I can't say anything

7    otherwise -- what the images represented, what they were.  I

8    thought -- stupidly, but I thought somehow in my mind I knew I

9    would never cross the line of soliciting or touching any of

10   them.  I never even had the fantasy to.  I never even

11   thought -- even knowing it was wrong, I never thought I could

12   get in this much trouble.  I could be facing -- what did you

13   say, 14 years?

14           I'm sorry, Your Honor, I did write a couple of things.

15           I want you to know that I would do anything to take

16   back what I did.  I stopped all involvement with child

17   pornography the day that the search warrant came, the day they

18   raided my house, the day, Your Honor, I honestly thought they

19   had the wrong person.  They came in with guns and bulletproof

20   vests.  I thought they were looking for someone who had died.

21   It wasn't until she said, what do you know about child

22   pornography, that I realized it was me that they were looking

23   for.  At that moment, I realized just how serious it was.  Guns

24   drawn?

25           I never even had a desire to look at it afterwards.

ECJKBENS

1    This happened in February of 2013.  I know regardless of what

2    the sentence is today, I'll never return to it again.  I can't

3    even come close to it.  I want you to know that my life has

4    been -- Your Honor, has been very blessed, but it's been very

5    conflicted.  I've read Ms. Choi's statement to you about this

6    sentencing guideline, and there was one sentence that really

7    stuck out to me.  She said that it's hard to reconcile my

8    background replete with academic success and overcoming the

9    challenges in my life with my behavior, and I have overcome

10   many challenges.  Most, and not all of them.  I wouldn't be

11   here before you today, Your Honor.

12          There are some things that have happened to me in my

13   childhood physically and sexually that I've never spoken about

14   ever to anyone, and there's nothing anyone could have done to

15   shield me from it.  It's not an excuse for what I looked at,

16   for what I did, I take responsibility for that.  But I want you

17   to know, Your Honor, that outward success, no measure of it

18   signals the absence of pain on the inside.  My smile in many

19   ways was masking what was going on on the inside, hurt that I

20   had for so many years, shame from things that happened that I

21   couldn't talk to anybody about.

22          It's clear from my past behavior that something was

23   completely out of whack.  There was a disconnect between what I

24   knew to be right and what I did.  And I didn't meet any of

25   these people that I gave my password to.  I didn't even know

ECJKBENS

1    them, it's an Internet relation, and within seconds, I'm giving

2    them the password, and I look back, and I say, what was I

3    doing?

4            I destroyed everything that I worked -- I can

5    remember, Your Honor, the day I decided to be a lawyer at 15,

6    and I destroyed it all.  For what?  For what gain?  For moments

7    of self-gratification, not even minutes.  I destroyed years of

8    promise and potential.  I did this, and I take full

9    responsibility for it.

10           Your Honor, for the 11 months that I've been in

11   therapy before and these four months -- I'm coming to a close,

12   Your Honor.

13           THE COURT:  No, it's all right.  I'm not rushing you,

14   I was going to get some tissues for your mother, if she needs

15   some.

16           THE DEFENDANT:  For the 11 months that I was in

17   therapy and the four months that I was in jail, I had a lot of

18   time to do a lot of thinking, not just about what I was drawn

19   to, but what I was running from.  And I was running from

20   serious insecurities and deep set inadequacies, feelings of

21   being unworthy, and the harsh, but real realization that

22   achieving certain things just didn't make me feel how I thought

23   they would.  This entire ordeal has made me deal with things

24   that I never wanted to talk about, things that I promised

25   myself I would never speak about, and I buried, but now I have

1   to deal with, and I have been dealing with.

2           Lastly, Your Honor, I want you to know I don't even

3   know a word in the English language for it, but the irony, the

4   irony in all of this is that in the past, when I would write

5   books and give speeches about -- to uplift people, it was never

6   about look how great I am, follow me, I talked about my

7   struggles, about the things that I've fallen from, how I was

8   able to get back up and how others can too, no matter how far

9   we fall, we still have a purpose, and even in this place right

10  now, regardless of what the sentence is, I know that I have a

11  purpose.

12          And this is a message I've been sharing even in the

13  jails that I've been in, and when I get out, whenever that is,

14  I will continue to share it.  I would have rather this didn't

15  happen, and I listened to my inner voice sooner, but this, too,

16  will be used to inspire.  This journey, this two-year journey,

17  has changed my life forever.

18          Regardless of where I am, I'll be 30 next year, and I

19  am a new creature.  All things have passed away, and old and

20  all things have become new.  This much, I'm certain of:  He who

21  began a good work in me will continue it until the day of

22  redemption.

23          Thank you, Your Honor.

24          THE COURT:  All right.  Thank you, Mr. Bennett.  Do

25  you need a minute just to catch your breath?

ECJKBENS

1          THE DEFENDANT:  I'm fine, no.

2          THE COURT:  Do you have a tissue or something?

3          THE DEFENDANT:  Yes.

4          THE COURT:  All right.

5          Catch your breath.  Let me tell you the sentence that

6     I intend to impose and my reasons for it.

7          In our system, judges have to give reasons, and I

8     think that's a good thing, it's a good thing because a

9     defendant shouldn't have to wonder what was going through a

10    judge's mind, nor should the defendant's family, who's

11    tremendously affected by a sentence, nor should the public.

12    That's why we have public proceedings, that's why we have court

13    reporters that make a record of everything that takes place.

14    And so judges have to give their reasons, and I'll endeavor to

15    do that now.

16          I've told you the different factors I have to

17    consider, and the hardest thing about being a judge are days

18    like this, imposing a sentence on another human being, a

19    complicated human being, a decent human being, somebody with

20    tremendous good qualities, somebody who's done many good things

21    in life, and I start with that because I want to make clear

22    that I understand that about you.  I look at your family, it's

23    heartbreaking to see what they're going through, and your

24    friends.  You've touched a lot of lives, and that's reflected

25    in the letters that I've received, it's reflected in who's here

ECJKBENS

today, and they're suffering along with you.  I wish that
weren't the case.  I wish there was some way I could make it go
away, but there really isn't.  It's the nature -- it's really
the nature of the human condition in a lot of ways, that we're
all connected to each other.  It's the nature of this process,
where punishment, which has many different objectives, does
have a cost on people, good people.

So I understand that about you, and so -- I mean, I
don't know you well, I know what I've read about you, and I've
read a lot, and I've given it a lot of thought.  You strike me
as a person with real ability, of course, that's obvious, and
somebody who cares about other people and has done much to help
others.  I think that's obvious too.  So I credit that.

I also credit what you have done since you were first
approached by agents in this case.  You haven't gone back, as
far as I can tell, to any kind of pornography, child
pornography in particular.  You've been law-abiding since then.
You were law-abiding in all other respects before your arrest.
You've taken treatment seriously, you've taken thinking about
what you've done seriously.  You seem to have a healthy
remorse, which I think is a good thing and a sign of health.
So I credit all those things, too.  Not everybody does have
those things, but you've demonstrated them, and so I consider
that.  It's not something I've overlooked.

But there are other, of course, things I have to

ECJKBENS

1    consider.  I have to consider the enormity of this crime.  And

2    as I've read these letters, as I've listened to the lawyers

3    speaking, I keep coming back to the fact that this is -- as

4    Ms. Cross-Goldenberg, who I have the greatest admiration for,

5    said, this is not a case about a predator, it's not a case

6    about a manufacturer, it's not a person who was engaged in

7    distribution for money, all true, it's a case about a broken

8    individual.  I guess that's true, also.  But it's also a case

9    about children.  It's a case about children who were exploited

10   and brutalized, and who were then brutalized again by callous

11   people, individuals who watched their suffering and ignored

12   their humanity.  There's just no way of getting around that.

13          So Ms. Cross-Goldenberg has asked me to consider the

14   entirety of your personhood, and of course, I do, and I have,

15   and I will.  That goes without saying.  I meant everything I've

16   said about you.  But that's not something you did when you

17   observed these children.  You didn't think about their

18   humanity.  You didn't think about, oh, my goodness, this is a

19   ten-year-old child in pain.  You didn't think about what it

20   would mean to that ten-year-old child ten years later to know

21   that people were sharing this, and passing it on, and accessing

22   it with a password that was fun, that was the password that

23   accessed this.  That's part of this crime, too.  And that's why

24   the penalties associated with it are high, and I think

25   appropriately high.  I'm not blindly following this book.  I

ECJKBENS

1  couldn't give a damn about this book.  It's something I have to

2  consider.  There are times I think it makes sense, there are

3  times I think it doesn't.

4           But this is a serious crime.  And I don't care what

5  the Second Circuit says or what the Guidelines Commission says,

6  I certainly think it's a serious crime.  I think that this goes

7  to the heart of what a society is supposed to be, which is to

8  protect the most vulnerable and to at least voice outrage when

9  the most vulnerable are exploited and brutalized.  If we don't

10  do that, if we can't muster that sort of conviction, then we

11  should give it up.  That's why this is a serious crime, as far

12  as I'm concerned.

13           You didn't make money off of this, but I don't know if

14  that is better or worse than sharing it for fun, because each

15  ignored the humanity of the children involved here.  There have

16  to be penalties for this.  This is not just about your own

17  personal journey.  I care about what happens to you in the

18  future.  I really do.  You matter, you're precious.  Your

19  mother and everybody here, including me, thinks that you are

20  special.  You are that, so that goes without saying.  But there

21  has to be a punishment component to this.  There has to be some

22  reflection of what took place here, what the crime was.  And I

23  think Ms. Cross-Goldenberg and I, as much as I respect her and

24  I hope she respects me, I think we just differ on this,

25  because, for me, this is a crime that has to carry a jail term

ECJKBENS

1    and a lengthy one, a lengthy one.

2            The maximum here is ten, the guidelines are 11 to 14.

3    I'm not moved by that.  I think it's worth noting just because

4    I'm required to note it, but from the moment I read the facts

5    of this case, it seemed to me that eight to ten is not

6    inappropriate, 11 to 14 is not inappropriate.  It's not that

7    I'm callous, it's not that I have no sense as to what that time

8    means to a young man like you who has so much promise, but it's

9    that the penalty has to send a message of moral outrage and a

10   message of conviction that children matter.

11           So, look, I have to credit the goodness in you.  The

12   fact that I don't think you're a predator, you are

13   distinguishable from many other defendants who are charged with

14   crimes like this, I'm prepared to come down below the

15   guidelines, down below the statutory maximum of ten, which

16   would be within the guidelines range, but it seems to me that a

17   sentence of seven years is as low as I can go without insulting

18   the victims in this crime.  And I know that's hard on the

19   family, it's hard on you, that's not lost on me, but those are

20   not the only considerations here, and I hope that at least you

21   can understand that, even if you don't agree with it.

22           So the sentence that I intend to impose is a sentence

23   of seven years' incarceration, to be followed by a term of

24   supervised release of five years with the terms and conditions

25   set forth in the presentence report.  I'm not going to impose a

ECJKBENS

1    fine.  I don't think you have the ability to pay a fine at this

2    point.  I will order a special assessment of $100.

3    Restitution, I'm going to put off for at least 90 days to

4    figure out what the parties have to say in response to what

5    submissions we received from the victim in this case -- one of

6    the victims in this case.

7          That's the sentence that I intend to impose.  Is there

8    any legal impediment to my imposing this sentence, Ms. Choi?

9          MS. CHOI:  No, I don't believe so, Your Honor.

10          THE COURT:  Ms. Cross-Goldenberg?

11          MS. CROSS-GOLDENBERG:  No, Your Honor.  Just the

12    objections that I've already raised to such a sentence.

13          THE COURT:  Right.  I meant really legal impediment in

14    the sense that I am engaging in illegal conduct or something

15    barred by statute.

16          MS. CROSS-GOLDENBERG:  I did want to address a couple

17    of conditions about supervised release.  I don't know when the

18    Court would like me to address it.

19          THE COURT:  Do that now.  That's fine.

20          MS. CROSS-GOLDENBERG:  Just with respect to treatment,

21    Your Honor, obviously we -- as I've said many times, treatment

22    seemed to be working well, and we would hope that he will

23    continue that.  But I would ask that the Court not impose a

24    condition of polygraph testing as recommended by probation, and

25    if the Court wants me to write on that or put it in more

ECJKBENS

1    detail, I'm happy to do that.  But I think there's been no

2    showing that those are reliable or fair, and many courts have

3    declined to impose that condition.

4          I would also ask that his records be released to

5    defense counsel.  We have --

6          THE COURT:  Records?

7          MS. CROSS-GOLDENBERG:  The treatment records, Your

8    Honor.

9          In my experience, treatment providers maintain the

10   position that they belong to probation and not to Mr. Bennett,

11   and without the Court's authorization, will not release them to

12   defense counsel.  So we would ask that the Court do that.

13         THE COURT:  All right.  With respect to the last one,

14   the records, I don't have any objection to that.  I'll give the

15   government a chance to be heard.

16         Ms. Choi, do you have a position?

17         MS. CHOI:  No, the government has no position on the

18   treatment records being released to the defendant, Your Honor.

19         THE COURT:  So that's fine.

20         And then with respect to the polygraph, does the

21   government have a position with respect to that?

22         MS. CHOI:  Maybe I'm just missing it, Your Honor, or

23   Ms. Cross-Goldenberg, if you could direct me to where that

24   provision is?

25         MS. CROSS-GOLDENBERG:  It's on page 25, the fourth

1  line under condition 1.

2          MS. CHOI:  Your Honor, I was wondering if there is any

3  way you could reserve decision on that question.  I don't know

4  what the reason for it is.  My understanding is that it's a

5  standard condition in these cases, but I would like the

6  opportunity to respond or at least consult with my chief on

7  that question.

8          THE COURT:  All right.  I'm respectfully going to

9  decline that request.  I'm going to include that as a

10 condition, but I'll leave it to the discretion of probation,

11 and if they think it's not appropriate or not necessary, then I

12 will defer to them.

13         If during the course of supervision, Mr. Bennett

14 wishes me to revisit that, that's something that can always

15 happen during the course of supervision.  But for now, I'm not

16 going to read it out of the conditions at this time.  I reserve

17 the right later to adjust it as necessary.

18         And then with respect to a facility, do you have any

19 recommendations?

20         MS. CROSS-GOLDENBERG:  Your Honor, if the Court could

21 recommend that he be housed by the BOP in a location as close

22 to Newport News, Virginia, as possible to facilitate visits

23 with his family, we would appreciate it.

24         THE COURT:  I will certainly make that recommendation.

25         So let me ask you, if you would, please, to stand,

ECJKBENS

1    Mr. Bennett.

2              Mr. Bennett, having accepted your guilty plea back in

3    September and having adjudged you guilty at that time, I now

4    sentence you as follows:  I sentence you to a term of

5    incarceration of seven years with credit for the time you

6    already served, so that's 84 months.  In addition, that will be

7    followed by a term of supervised release of five years.  That

8    term of supervised release will include the following mandatory

9    standard and special conditions:  The mandatory conditions are

10   that you not commit another federal, state or local crime; that

11   you not illegally possess a controlled substance of any kind;

12   that you not possess a firearm or a destructive device of any

13   kind; and that you cooperate in the collection of DNA as

14   directed by the probation officer.

15             I'm not going to require you to undergo drug treatment

16   or testing at this point.  I'm going to have some specific

17   special conditions that may include that.  I'm not going to

18   otherwise require you to get mandatory drug testing, which is a

19   typical mandatory condition.

20             There are 13 standard conditions.  Those are imposed

21   in virtually every case involving supervised release.  I'm

22   going to impose those, too, here, but I'm also going to impose

23   some additional special conditions.  The special ones, that you

24   shall undergo a sex offense specific evaluation and participate

25   in a sex offender treatment and mental health treatment program

ECJKBENS

approved by the probation officer, you shall abide by the

rules, requirements and conditions of that treatment program.

That program may include submission to polygraph testing.

You shall waive your right to confidentiality in any

records for mental health assessment and treatment, so that

those records can be shared with probation, and so that

probation can also share information with the treatment

provider.  I'll expect or direct that you participate or

provide some -- that you contribute to the costs of this

program, if you can.  So if you're earning enough money, if

you've got access to insurance, I'll ask you to help defray the

cost of that program.  If you don't have enough money, if you

don't have insurance or other ways to cover the costs, then the

Court will bear the costs because it's important that you get

that treatment.

In addition, you will participate in a computer

Internet monitoring program administered by the probation

office.  You shall provide the probation officer in advance

with notification of any computers or other devices that you

are using or have access to, including any access to the

Internet.  The probation officer is authorized to install

monitoring devices at a monthly rate provided by the probation

office.  That will be subject to periodic adjustments.  You

will be notified -- probation shall be notified of any

impermissible, or suspicious activity, or communications that

ECJKBENS

occur over the computer or the device.  And so all of this is

set forth on page 25, but that's a condition that I expect that

you will comply with, okay?

Examination is not limited to retrievable and copying

of data from the computers or devices.  It may involve removal

of equipment for the purposes of conducting a more thorough

search so they can search and inspect as needed.

A third and special condition is that you will submit

your person, your property, your home, your residence, your

vehicle, your papers, computers, any other devices that you

have, to a search in the event that the probation officer

believes that there may be evidence of a crime or evidence of a

violation of the terms of your supervised release.  That search

will have to be conducted in a reasonable manner and at a

reasonable time, but you are required to comply with the search

request.  You can't just deny probation the opportunity to

search, that would be a violation of the terms of your

supervised release.

You are also to notify any person with whom you share

premises or control premises to let them know that you're

subject to this search requirement.  This is so they can take

steps to protect their own privacy.  So you do have to let any

adults with whom you reside know that.

And then finally, you'll participate in a program

approved by the probation office, which may include testing to

ECJKBENS

1    determine whether you are using drugs or alcohol.  Again,

2    you'll be expected to help defray the costs of that program if

3    you have access to insurance or you have the ability to help

4    pay for the program.

5              And I will also authorize the exchange of evaluations

6    between probation and the treatment provider and vice versa.

7              You are to report to the nearest probation office

8    within 72 hours of your release -- I'm going to say 24 hours

9    within your release from custody.  You will be supervised in

10   the district of your residence.

11             Do you know where you plan to live?

12             THE DEFENDANT:  Seven years from now, sir?  No, sir.

13             THE COURT:  All right.  Well, wherever you end up,

14   that will be where you're supervised.

15             THE DEFENDANT:  Okay.

16             THE COURT:  It will probably be this district first,

17   and then if we need to transfer it, we can do that.  Some

18   people know exactly where they're going to be on release.

19             As I said, I'm not going to impose a fine.  I will

20   impose a special assessment of $100, and I'm going to reserve

21   on restitution.

22             Are there open counts?

23             MS. CHOI:  No, Your Honor.

24             THE COURT:  All right.

25             So I should tell you, Mr. Bennett, you have a right to

ECJKBENS

1    appeal this sentence.  So if you wish to appeal, you would need

2    to file a notice of appeal within two weeks.  I think probably

3    two weeks from Monday, because I don't think I'll probably get

4    the judgment out till Monday.  So that's a pretty strict

5    deadline, so you'll need to file that within two weeks.  It's

6    not the whole appeal, it's not the beef, it's just a notice of

7    appeal.

8            Talk to Ms. Cross-Goldenberg, she'll explain that, and

9    she will assist you in filing it.  The fee would be waived for

10   you, so you don't have to worry about a filing fee, okay?

11           THE DEFENDANT:  All right.

12           THE COURT:  Are there any other issues we should

13   resolve today?

14           MS. CHOI:  Two issues, Your Honor.  If the Court could

15   inform the defendant of his obligations to report under the Sex

16   Offender Registration and Notification Act?

17           THE COURT:  Okay.

18           You should understand, Mr. Bennett, that you have

19   obligations under the law to register as a sex offender under

20   the Sex Offender Notification Act, however the term is defined.

21   There are federal and state statutes that relate to this, so

22   you have an obligation to do that.  That will be part of your

23   supervised release, really, because to fail -- your failure to

24   do that would be another crime, and so be mindful of your

25   obligations in that regard, okay?

ECJKBENS

1          Anything else?

2          MS. CHOI:  Your Honor, sentencing practices require

3     that the parties submit an unredacted version of the sentencing

4     submission to be filed under seal.  With regard to the

5     government, we've marked the pages that we believe we will

6     redact, and we will post our redacted version on ECF, Your

7     Honor.

8          THE COURT:  Okay.  So you have sent me the unredacted?

9          MS. CHOI:  Yes, Your Honor.

10         THE COURT:  And you've got now the redacted?

11         MS. CHOI:  I have the redacted, I've reviewed it with

12    Ms. Cross-Goldenberg, and she agrees with the redactions that I

13    have proposed.

14         THE COURT:  You're going to hand them up?

15         MS. CHOI:  I'm handing you the copy that should be

16    sealed.

17         THE COURT:  Okay.  Thank you.  I'll take a look.

18         MS. CHOI:  It's the same as what Your Honor has

19    already.

20         THE COURT:  Oh, okay.

21         Ms. Cross-Goldenberg, anything else we should cover

22    today?

23         THE DEFENDANT:  Is there a way that you would allow

24    me, before I leave, to just be able to hug them before I leave?

25         AUDIENCE MEMBER:  Please.

ECJKBENS

1        THE COURT:  I think I probably can't.  The marshals,

2   I'm afraid, won't allow that.  Mr. Bennett, it's not that I

3   don't trust you, it's just that the marshals have --

4        THE DEFENDANT:  My mother, you're saying?  Because she

5   just came from --

6        AUDIENCE MEMBER:  I haven't seen him.  Please, Your

7   Honor, just let me hug my baby.

8        THE COURT:  I'm afraid I can't do that just because

9   the marshals have procedures that they have to follow.

10        THE DEFENDANT:  I understand.  Thank you, sir.

11        THE COURT:  No, I'm very sorry.

12        THE DEFENDANT:  That's fine.  I understand, sir.

13        THE COURT:  All right.  Mr. Bennett, that's a tough

14   sentence, it's a hard thing for you and your family.  I

15   understand that, and I really am sympathetic.  I mean what I

16   said, which is that I think you're a young man, you've got a

17   bright future, and I agree with what you said before, you will

18   rise from this.  This doesn't define you.  There is a great

19   deal to you, and so my hope is that you will continue to

20   realize that and to explore that, and that you will be a source

21   of comfort and inspiration to people even while you're in

22   custody.  And, in fact, people in custody are often the most

23   vulnerable in our society, so you can do great things for

24   people who are in need.  I hope you'll do that.

25        I hope you'll continue to be there for your family,

ECJKBENS

1   even though you may be separated from them.

2           And for those who are here today, I hope you will

3   continue to support Mr. Bennett.  He's going to need that

4   support as much as ever, and so I hope that that will continue.

5           Thanks for being here today.  It's a very hard thing

6   on a family, it's a very hard thing on people who are close to

7   the individual being sentenced.  It's a very hard thing.  Even

8   if you disagree with the sentence, I hope that at least you

9   leave here believing that it was a careful sentence.  It was

10  not vindictive, it wasn't meanspirited, it was just an endeavor

11  on my part, as best that I can, to use the judgment that I've

12  been entrusted with.

13          So good luck, and thanks very much.

14          Let me thank the marshals, and let me thank the court

15  reporter as well.  Have a good day.

16                                 * * *

17

18

19

20

21

22

23

24

25